33 A.3d 602

COMMONWEALTH of Pennsylvania, Appellee

v.

David Richard RAMTAHAL, Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 14, 2010.

Decided Dec. 21, 2011.

318

Ronald H. Elgart, Fairless Hills, for David Richard Ramtahal.

Amy Zapp, PA Office of Attorney General, Harrisburg, Robert Douglas James, Bucks County District Attorney's Office, David Ward Heckler, Stephen B. Harris, Warrington, for Commonwealth of Pennsylvania.

320

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice ORIE MELVIN.

David Richard Ramtahal appeals from the sentence of death imposed on May 18, 2009, in the Court of Common Pleas of Bucks County after a jury convicted him of first-degree murder, criminal conspiracy, two counts of possessing an instrument of crime, and three counts of robbery. We affirm the judgment of sentence.

The evidence of record establishes that on the evening of November 15, 2006, Appellant and his codefendant, Nyako Pippen, were driving through Winder Village, a high-crime area in Bristol Township, Bucks County, when they observed Shawn Parker, Jarrett Osborne, and Jamar Osborne standing together on a street corner. Based on the reputation of the neighborhood, Appellant and Pippen surmised that the men were likely drug dealers who possessed large sums of cash and would not alert police if robbed of their drug proceeds. Thus, Appellant and Pippen viewed the men as prime targets and conspired to rob them at gunpoint. Appellant drove to a nearby playground where he and his confederate armed themselves and concealed their identities; Appellant donned a ski mask and carried a nine-millimeter Kel–Tec handgun while Pippen procured a sawed-off shotgun and tied a t-shirt around his face.

Appellant and Pippen drove back into the residential area where the three men were standing, parked in front of a house, and approached the targeted individuals on foot. As they neared the trio, Pippen raised the shotgun and attempted to cock the weapon, but the gun jammed. Alerted to their assailants' presence, Parker and his companions fled on foot. As the three men were running along Elmhurst Avenue, Appellant pointed his handgun at them and fired a single round from a distance of approximately seventy feet, wounding Jarrett Osborne in the buttocks. Jarrett ran a short

distance, fell to the ground, and began writhing in pain. Appellant and Pippen immediately returned to their vehicle and drove off while Jamar Osborne summoned emergency medical personnel to the scene. Paramedics arrived three minutes later and placed Jarrett inside an ambulance where he suffered cardiac arrest and heart failure on the way to Frankford–Torresdale Hospital. Subsequent efforts to revive Jarrett were unsuccessful, and he was pronounced dead at 11:43 p.m. An autopsy revealed that the bullet traveled through the pelvis and severed a large blood vessel called the iliac artery, causing high volume blood loss that ultimately resulted in Jarrett's death.

Homicide investigators amassed a substantial amount of evidence tying Appellant to the fatal shooting. Detective Greg Beidler of the Bristol Township Police Department testified that he responded to the police radio dispatch concerning the incident and recovered two objects at the crime scene: a fired nine-millimeter shell casing and a black neoprene ski mask. *See* N.T. Trial, 5/11/09, at 143. The shell casing and the bullet recovered from Jarrett Osborne's body were submitted to a firearms examiner employed by the Montgomery County District Attorney, and the ski mask was sent to the Pennsylvania State Police Crime Laboratory in Bethlehem for forensic analysis. *Id.* at 150, 155. The nose and mouth areas of the ski mask were swabbed and found to contain genetic material that produced a single DNA profile of an unknown male. After recovering the Kel–Tec handgun and acquiring information that identified Appellant as a suspect, police obtained a search warrant for a DNA sample and submitted genetic material provided by Appellant to the crime laboratory for analysis.[1] The known sample procured through

1. Detective Beidler testified at a grand jury hearing that the Kel–Tec handgun was recovered near another crime scene where it had been discarded after being carried by a participant in a botched home invasion robbery that occurred on January 25, 2007 in Montgomery County. *See* N.T. Hearing, 3/20/08, at 43, 46. The gun's grips and slide serrations contained traces of genetic material that matched Appellant's DNA profile. *Id.* at 48. Appellant, Pippen, and four others were prosecuted for the January 25, 2007 robbery, which resulted in the murder of Kelly Carter–Hernandez. Appellant, who shot Carter–

the search warrant exhibited the same DNA profile as samples collected from the ski mask and the Kel–Tec handgun. *Id.* at 157; *see also* N.T. Trial, 5/12/09, at 6. All of the DNA evidence was entered by way of stipulation; the defense conceded the accuracy of the laboratory reports. Furthermore, expert analysis of the firearm, shell casing, and projectile removed from Jarrett Osborne's body revealed that the fatal shot had been fired from the Kel–Tec handgun that bore traces of Appellant's DNA. *See* N.T. Trial, 5/12/09, at 88.

Investigators also analyzed cellular telephone traffic and discovered a series of telephone calls linking Appellant and Pippen to Winder Village at the time of the shooting. Detective Beidler explained to the jury that telephone records showed Appellant and Pippen began using their cellular telephones in Philadelphia before placing calls which indicated that they were traveling toward Bristol Township on the night in question. At 9:40 p.m., Pippen's telephone transmitted a signal to a cellular telephone tower located in Bristol Township, and another call made by Pippen at 10:36 p.m., approximately four minutes after Jamar Osborne contacted a 911 operator to request an ambulance for the victim, was traced to a tower "just outside of [the] Winder Village neighborhood." N.T. Trial, 5/11/09, at 175. Subsequent calls placed by Appellant and Pippen after 11:00 p.m. demonstrated that both men returned to their homes in Philadelphia upon leaving the Winder Village area. *See id.* at 176–177.

The cellular telephone evidence was corroborated by Appellant's codefendant, Nyako Pippen, who appeared as a prosecution witness in accordance with a plea agreement that enabled him to plead guilty to third-degree murder in exchange for a twelve-to-twenty-four-year prison sentence. Pippen testified that on the night of the murder, he and Appellant drove to Bristol Township at approximately 9:00 p.m. to socialize with some women, but their plans fell through, and the two men

Hernandez in the neck with a .40 caliber handgun, pled guilty to first-degree murder, robbery, and conspiracy and was sentenced to life imprisonment. Pippen was convicted by a jury of robbery and second-degree murder for his role in the Carter–Hernandez homicide.

ended up "just riding around." N.T. Trial, 5/12/09, at 15. As they proceeded through Winder Village, they observed a group of men standing on the corner of Elmhurst Avenue and Winder Drive, and Appellant "brought up the idea of robbing them" because they appeared to be drug dealers conducting business in an area known for drug activity. *Id.* at 16.

Appellant drove to a playground where they decided that Appellant would hold the victims at gunpoint while Pippen searched their pockets for money. After concealing their identities, Appellant drove back up Elmhurst Avenue and parked in front of a house. Appellant supplied Pippen with a sawed-off pump-action shotgun, and they approached the men on foot; however, as the targets came into view, Pippen tried to cock his weapon, and the three men "took off running." *Id.* at 27. Pippen testified that he immediately retreated to Appellant's vehicle, and, at that time, he saw Appellant point his pistol at the fleeing men. Pippen heard a gunshot as he returned to the car, placed his shotgun in the trunk, and re-entered the vehicle through the passenger-side door. Appellant returned to the vehicle moments later and began driving toward Philadelphia. When Pippen asked if one of the men discharged a gun during the incident, Appellant replied in the negative and stated that he had fired one round "in the air to scare them." *Id.* at 32. Pippen claimed that several months passed before he learned that someone had been killed during the robbery attempt at Winder Village. *Id.* at 49.

The defense did not dispute Pippen's version of the incident or deny that Appellant fired the bullet that killed Jarrett Osborne. Instead, defense counsel argued throughout the trial that the killing was unintentional based on evidence that the barrel in Appellant's handgun had been altered in a manner that made the weapon "inherently inaccurate." N.T. Trial, 5/11/09, at 34. In support of this claim, counsel referenced the testimony of two firearm examiners with expertise in ballistics and marksmanship, both of whom test-fired the murder weapon and concluded that its accuracy had been degraded when someone reamed the barrel with an unknown

object to alter the rifling and hinder firearm identification.[2] The Commonwealth's expert, Montgomery County Detective John Finor, testified that he took the handgun to an indoor shooting range, fired six bullets for accuracy at a distance of seventy-five feet and found that the bullets formed a group ten inches in diameter that impacted the target approximately 12.5 inches to the left of center. *See* N.T. Trial, 5/12/09, at 112–113. Defense expert Carl Leisinger III achieved similar results when he fired the gun at an outdoor range, creating a six-inch-diameter group at seventy-five feet with the bullets striking the right side of the target. *Id.* at 133. Mr. Leisinger also tested for accuracy at one hundred feet and found that the bullets drifted so far to the right at that distance that he could not hit the target when aiming at the center; however, by aiming at "the extreme left side" of the target, Mr. Leisinger was able to hit the target fifty percent of the time. *Id.*

Appellant requested a demurrer to the charge of first-degree murder on the basis that there was no evidence to support a determination that the killing was premeditated. That request was denied, and he was subsequently convicted of the aforementioned crimes. At the penalty phase, the jury recommended a sentence of death after finding two aggravating factors and one mitigating factor.[3] Appellant was formal-

**2.** Firearm identification involves scientific examination of fired bullets and cartridge cases for the purpose of identifying the weapon that expelled them. Modern firearm barrels contain rifling, a series of spiraling grooves that enhance accuracy by generating spin that stabilizes the bullet as it exits the barrel. Microscopic marks left on the bullet as it contacts the rifling create a unique signature that enables firearm examiners to determine whether a bullet recovered from a crime scene was fired from a particular gun. Some individuals who are aware of this occurrence alter the original rifling by reaming the barrel with a foreign object in an attempt to preclude examiners from making a positive identification. *See* N.T. Trial, 5/12/09, at 80–86.

**3.** The aggravating factors found by the jury were as follows: the victim was killed during the perpetration of a felony, *see* 42 Pa.C.S. § 9711(d)(6), and Appellant has a significant history of felony convictions involving the use or threat of violence to the person, *see* 42 Pa.C.S. § 9711(d)(9). As for mitigating circumstances, the jury found that Appellant established the "catchall" mitigator codified at 42 Pa.C.S. § 9711(e)(8).

ly sentenced to death for first-degree murder on May 18, 2009 and received a consecutive forty-to-eighty-year term of imprisonment for the remaining charges. Appellant's post-sentence motions were denied on May 26, 2009. This appeal followed, wherein Appellant argues that: (1) the evidence was insufficient to convict him of first-degree murder; (2) the verdict was contrary to the weight of the evidence; (3) the trial court abused its discretion in limiting cross-examination of a prosecution witness; and (4) a new penalty hearing is warranted because the jury failed to specify what considerations prompted it to find the mitigating circumstance codified at 42 Pa.C.S. § 9711(e)(8).

 Although this Court is required to review the sufficiency of the evidence supporting a first-degree murder conviction in every capital prosecution regardless of whether the defendant raises the issue on direct appeal, *see* 42 Pa.C.S. § 9711(h)(1), as noted above, Appellant does present a sufficiency argument in this case. In evaluating the issue, we must determine whether the evidence admitted at trial and all reasonable inferences derived therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner, supports the jury's finding that every element of the offense was proven beyond a reasonable doubt. *Commonwealth v. Smith,* 604 Pa. 126, 985 A.2d 886, 894–895 (2009). The Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence, and the jury, which passes upon the weight and credibility of each witness's testimony, is free to believe all, part, or none of the evidence. *Commonwealth v. Laird,* 605 Pa. 137, 988 A.2d 618, 624 (2010).

 In order to sustain a conviction for first-degree murder, the Commonwealth must demonstrate that a human being was unlawfully killed; the defendant was responsible for the killing; and the defendant acted with malice and a specific intent to kill, *i.e.,* the killing was performed in an intentional, deliberate, and premeditated manner. *Commonwealth v. Chamberlain,* 30 A.3d 381, 394, (Pa.2011). Specific intent may be established through circumstantial evidence, such as the

use of a deadly weapon on a vital part of the victim's body. *Smith*, 985 A.2d at 895. Malice also may be inferred from the use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Houser*, 18 A.3d 1128, 1134 (Pa.2011) (citations omitted).

■ Appellant concedes that he killed the victim without lawful justification; he simply contends that the evidence was insufficient to convict him of first-degree murder because "[t]he particular weapon that was employed, the distance [that the bullet travelled before striking the victim], the post-shooting statement made by [Appellant] to [Pippen] and the manner in which the single shot was fired, whether considered individually or collectively, render this verdict ... illegitimate." Appellant's brief at 14. Stated more succinctly, Appellant maintains that a single bullet fired from an inaccurate handgun at a considerable distance is insufficient to support a finding of premeditation, particularly where, as here, the bullet struck the victim in the buttocks.[4] Based on the totality of the circumstances, Appellant characterizes the events that prompted the killing as "the classic definition" of second-degree murder. *Id.*

Upon review, we reject Appellant's argument and find that the evidence was sufficient to prove each element of first-degree murder. The Commonwealth presented testimony that

4. In his brief, Appellant emphasizes that evidence was presented at trial indicating that he may, in fact, have fired the fatal shot from a distance of 159 feet. *See* Appellant's brief at 16. That number is based on testimony that investigators used a laser to measure the distance between the spent shell casing and a pool of blood that formed at the spot where Jarrett Osborne collapsed. *See* N.T. Trial, 5/11/09, at 185–186. The laser calculated the distance between the casing and the blood at 174 feet. *Id.* at 186. Characterizing that figure as a incontrovertible fact, Appellant maintains that the bullet was fired from a distance of 159 feet based on testimony suggesting that Jarrett ran five feet after he was wounded and testimony that the murder weapon ejected one shell casing ten feet behind Mr. Leisinger as he was test firing the gun. In actuality, however, there was conflicting testimony on this point, as Shawn Parker testified that Appellant was "probably 60 to 70 feet" away when he fired the pistol. *Id.* at 67. Contrary to Appellant's position, no one is certain of the exact distance that the bullet traveled before it struck the victim, and the jury was free to accept Mr. Parker's estimate.

Appellant pointed a loaded handgun at Jarrett Osborne and fired a bullet that pierced an artery in Osborne's pelvis, causing his death. While the firearm experts agreed that the murder weapon became less accurate when the barrel was reamed with a foreign object, both experts were able to hit paper targets at a distance of seventy-five feet, the approximate range described by Shawn Parker. Moreover, the factors that purportedly show a lack of malice and specific intent, i.e., the number of shots fired, the distance the bullet traveled, the location of the entry wound, and Appellant's self-serving claim that he merely fired into the air to cause fear, do not establish a right to relief. The question herein is whether the evidence proffered at trial, viewed in the light most favorable to the Commonwealth, was sufficient to prove beyond a reasonable doubt that Appellant committed an unlawful killing in an intentional, deliberate, and premeditated manner. We find that the Commonwealth met its burden of proof, as the evidence supported an inference that Appellant deliberately fired a handgun at Jarrett Osborne, piercing a vital artery. Thus, we hold that there was sufficient evidence for the jury to conclude that Appellant acted with malice and a specific intent to kill the victim, and committed the killing in an intentional, deliberate and premeditated manner. See 18 Pa. C.S. § 2502(d).

█ Next, Appellant asserts that the verdict was contrary to the weight of the evidence for the same reasons articulated in his challenge to the sufficiency of the evidence. Specifically, Appellant contends that the evidence did not demonstrate that he harbored a specific intent to kill the victim, and, as the killing occurred during the commission of a felony, the offense is properly graded as second-degree murder. In leveling this claim, Appellant reiterates that he shot the victim from a distance of 159 feet, that the bullet struck the victim in the buttocks, and that Pippen testified Appellant claimed to have fired into the air to scare the men as they attempted to flee.

A motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. An appellate court, therefore,

reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence. The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings.

*Commonwealth v. Diggs*, 597 Pa. 28, 949 A.2d 873, 879–80 (2008) (quoting *Commonwealth v. Cousar*, 928 A.2d 1025, 1035–36 (Pa.2007)).

The common pleas court declined to grant Appellant a new trial, finding that the verdict was amply supported by competent evidence. We agree with that assessment. Appellant's argument is nothing more than a veiled attempt to have this Court re-weigh the evidence and substitute our judgment for that of the jury, which is wholly improper. Having reviewed the record in its entirety, we discern no abuse of discretion with respect to the rejection of Appellant's weight-of-the-evidence claim.

■ In his third issue, Appellant contends that the trial court abused its discretion in preventing defense counsel from cross-examining Detective Beidler about a portion of Appellant's grand jury testimony wherein Appellant stated that he had no formal firearms training and possessed only a rudimentary understanding of how handguns function. *See* N.T. Trial, 5/11/09, at 183. Appellant avers that this aspect of his grand jury testimony was critical to his defense because it would have established a general unfamiliarity with handguns, thereby bolstering the defense's position that Appellant lacked the necessary skills to hit a moving target at a range of 159 feet. As for admissibility, Appellant contends that the prosecutor

"opened the door" to this line of questioning by having Detective Beidler read another portion of Appellant's grand jury testimony aloud for the jury herein. Appellant's brief at 25.

The Commonwealth counters that the ruling at issue was proper because Appellant's grand jury testimony concerning his lack of firearm training constituted inadmissible hearsay. The Commonwealth also disputes that the prosecutor opened the door for such questioning, emphasizing that the grand jury testimony reviewed on direct examination of Detective Beidler did not pertain to firearms.

█ The scope of cross-examination is within the trial court's discretion, and this Court cannot disturb the trial court's determinations absent a clear abuse of discretion or an error of law. *Commonwealth v. Rivera*, 603 Pa. 340, 983 A.2d 1211 (2009).

Upon review, we concur with the Commonwealth's analysis. The record reveals that, on direct examination, Detective Beidler read, without objection, a brief excerpt from Appellant's grand jury testimony wherein Appellant described his relationship with Nyako Pippen and indicated that he occasionally used a certain vehicle and a cellular telephone provided by Pippen's father. *See* N.T. Trial, 5/11/09, at 180–182. There was no mention of firearms. Later, on cross-examination, defense counsel attempted to question the detective about an unrelated portion of Appellant's grand jury testimony dealing with firearms. The prosecutor objected, and the trial court sustained the objection, stating that the proposed line of questioning was improper. *Id.* at 184.

█ The term hearsay is defined as "a statement, other than one made by the declarant made while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c). As the Commonwealth accurately points out, the grand jury testimony that defense counsel sought to discuss at trial constituted hearsay; the statements were made by Appellant at a separate proceeding, and they were being offered to prove the truth of the matter asserted, *i.e.*, that Appellant lacked marksmanship skills. In

addition, the statements at issue were not admissible under the hearsay exception for former testimony because Appellant invoked his Fifth Amendment right against self-incrimination multiple times when questioned about firearm usage at the grand jury hearing, thus denying the Commonwealth an adequate opportunity to develop his testimony on the issue. *See* Pa.R.E. 804(b)(1).[5]

Furthermore, the Commonwealth did not open the door for defense counsel to question Detective Beidler about firearm-related grand jury testimony. The excerpt that was read aloud on direct examination conveyed Appellant's admission that he was acquainted with Nyako Pippen and that he had access to the car and cellular telephone that he used on the night of the murder. As noted above, that excerpt did not contain any references to firearms. Hence, defense counsel was clearly not entitled to discuss unrelated hearsay statements concerning firearms on cross-examination, and the trial court did not abuse its discretion in precluding that line of questioning.

Finally, Appellant contends that the jury's failure to specify what considerations prompted it to find the mitigating circumstance codified at 42 Pa.C.S. § 9711(e)(8) precludes meaningful appellate review of the death sentence because this Court "cannot review the decision of the jury to determine if the sentence of death 'was the product of passion, prejudice, or any other arbitrary factor....'" Appellant's brief at 27. Although Appellant expressly concedes that the "Commonwealth has never required the non-statutory mitigators ... to

5. Rule 804(b)(1) states that testimony provided by a witness at a different proceeding may be admitted if the declarant is unavailable to testify, and the party against whom the statement is being offered "had an adequate opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." In this case, the notes of testimony from the grand jury hearing conducted on May 8, 2008 establish that Appellant refused to answer multiple questions posed by the assistant district attorney concerning the number of times Appellant has fired a handgun. *See* N.T., 5/8/08, at 81–82. As the attorney could not force Appellant to answer those questions, the Commonwealth did not have an adequate opportunity at that hearing to impeach Appellant's self-serving assertion that he had only a basic understanding of handguns.

be set forth on the verdict form," he nevertheless maintains that there should be such a requirement, and the absence of specific findings in the case at bar necessitate the grant of a new penalty hearing. *Id.* For reasons discussed below, we find this claim to be waived.

The crux of Appellant's position is that the verdict slip used for the penalty phase was deficient because it did not list individual mitigating factors for the jury to consider pursuant to 42 Pa.C.S. § 9711(e)(8). Section 9711(e)(8), which is often referred to as the "catchall" mitigator, permits consideration of "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." [6] During the penalty hearing in this case, the Commonwealth presented the trial court with a verdict slip that complied with Pa.R.Crim.P. 808, which does not require the information Appellant asserts is necessary for appellate review, and the court specifically inquired if defense counsel "approved of the format of the verdict slip." N.T. Hearing, 5/15/09, at 81. Defense counsel replied, "I do, Your Honor," and the matter was concluded. *Id.* As no objection to the form of the verdict slip was lodged in the trial court, the issue before us is waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *Commonwealth v. Birdsong,* 24 A.3d 319, 333 n. 13 (Pa.2011).

■■■■■■ Having found that Appellant's convictions are proper and that none of his claims merits relief, we must affirm the sentence of death unless we find that: (i) the sentence was the product of passion, prejudice, or any other arbitrary factor, or (ii) the evidence does not support the finding of at least one aggravating circumstance. *See* 42 Pa.C.S. § 9711(h)(3). Upon careful review of the record, we find that the sentence was not the product of passion, prejudice, or any other arbitrary factor, but resulted from properly-admitted evidence that Appellant intentionally and deliberate-

6. As noted *supra,* the jury herein found that Appellant established this mitigating factor, although it ultimately recommended a sentence of death.

ly shot Jarrett Osborne in the pelvis with a handgun. We also conclude that the evidence was sufficient to support the two aggravating circumstances found by the jury. Appellant's prior convictions for robbery, conspiracy to commit robbery, and first-degree murder established a significant history of felony convictions involving the use or threat of violence to the person, *see* 42 Pa.C.S. § 9711(d)(9), and it was undisputed at trial that Jarrett Osborne was killed during the perpetration of a felony, *see* 42 Pa.C.S. § 9711(d)(6).

For the reasons stated herein, we affirm the verdict and sentence of death. The Prothonotary of this Court is directed to transmit the complete record of this case to the Governor of Pennsylvania in accordance with 42 Pa.C.S. § 9711(i).

Chief Justice CASTILLE, Justices SAYLOR, EAKIN, BAER, TODD, and McCAFFERY join the opinion.