J. S83003/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: | : | IN THE SUPERIOR COURT OF |
| B.A.C., A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  B.A.C., A MINOR | : | No. 1652 WDA 2015 |
| | : | |

Appeal from the Order Entered September 17, 2015,
in the Court of Common Pleas of Erie County
Criminal Division at No. CP-25-JV-0000049-2015

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN AND STRASSBURGER,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED DECEMBER 22, 2016**

B.A.C. appeals from the juvenile dispositional order entered in the Court of Common Pleas of Erie County on September 17, 2015, adjudicating him as a delinquent and in need of treatment, supervision, and rehabilitation after the juvenile court adjudged him delinquent of rape, sexual assault, aggravated indecent assault, indecent assault, and indecent exposure.[1]  We affirm.

The juvenile court set forth the following, gleaned from the delinquency hearing:

> The Commonwealth first called S.S. to testify. S.S. testified that she is currently seventeen years old and was born [in April 1998].  Appellant is her cousin.  She identified Appellant on the record.  S.S.

---

* Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3121(a)(1), 3124.1, 3125(a)(1), 3126(a)(1), and 3127(a), respectively.

continued that, beginning December 26, 2008, she and her siblings moved into Appellant's home. She stated that her aunt and uncle, M.C. and A.C., Sr., had eleven people living in the house at the time, to include their children, Appellant, R.C., B.C., J.C. and S.C.; and S.S.'s siblings, Z.S., St.S. and C.S. There was a period of time wherein S.S. and Appellant did not live in the home after it was destroyed by fire. S.S. and Appellant moved back into the home in 2013. As the house was being rebuilt, everyone had rooms in the first unfinished floor which S.S. referred to as the "basement." S.S. slept in a basement room with her sisters, St.S. and C.S. Appellant shared a room with his brother R.C. and S.S.'s brother, Z.S.

S.S. testified to three separate events from 2014. S.S. claimed that, one night, Appellant came into her bedroom and woke her up. He subsequently attempted to "force [her] to have sex with him."[2] R.C., however, was awake and came into the room and "caught him." A second event also happened earlier in the summer of 2014, when S.S. and Appellant were sitting on the couch. Appellant "forced [S.S.'s][3] hand down his pants" and on his penis. S.S. testified that she never told her aunt and uncle, M.C. and A.C., Sr., about these incidents because she felt they would not believe her. S.S. claimed that on a prior occasion, in the winter, when she was in fifth grade, Appellant and his brother B.C. "teamed up" against her and her friend Courtney to "dry hump" them. S.S. stated she told M.C. about this incident and M.C. instructed her not to say or do anything.

S.S. also testified to the events of June 21, 2014. That summer, S.S. worked the Wattsburg Fair with Larry Wellman. S.S. testified that on one day in June 2014, Mr. Wellman brought her, Appellant and Appellant's brother R.C. to the Wattsburg

---

[2] Brackets within quotation marks in original.

[3] Brackets in original.

Fairgrounds to work on flyers. They arrived between nine and ten o'clock in the morning. S.S. and the others joined another lady, whose name S.S. could not recall,[Footnote 2] in the Wattsburg Fairgrounds office. The fairgrounds were not open, and the five of them were the only people there.

> [Footnote 2] The other lady was identified later in the testimony as Rosella Fenno.

At one point, Larry left to take R.C. home so that he could join his girlfriend at the races. S.S. testified that they were the only people at the Fairgrounds and the other buildings were abandoned. Shortly after that, S.S. left to go to the bathroom, which is located in the "Lowe's building" fifty to sixty yards away from the office. The "Lowe's building" consists of a large open space with a men's and women's bathroom on the far end. The women's bathroom consisted of [a] sink to the right hand side, followed by three regular bathroom stalls and then one handicapped stall. As S.S. was sitting in the first bathroom stall, she saw Appellant's feet behind the stall doors. She knew they were Appellant's feet because of his shoes. After she finished, she washed and dried her hands. S.S. testified that Appellant did not say anything to her during this time, but stood in the doorway. Subsequently, Appellant refused to let her leave the bathroom. S.S. testified that he prevented her from leaving by "stopping [her][4] with his chest." S.S. estimated that she is five feet four inches tall and weighs one hundred and twenty pounds, and that Appellant is taller and stronger than she is. The Court took judicial notice that Appellant is approximately six feet two inches tall.

S.S. told Appellant "Stop" and said "Let me out." Instead, Appellant pushed S.S. back toward the garbage can. He then put his hands on her shoulder and pushed her into the handicapped stall.

---

[4] Brackets in original.

Appellant continued and pulled down S.S.'s pants and underwear together, and his pants and underwear together. Appellant then "took his leg and put it behind [S.S.] and took [her] up behind [her] legs and had his hands on [her] shoulders and laid [her] on the ground."[5] S.S. testified that the bathroom contained [a] cement floor and it was cold. Appellant held S.S. on the floor by the wrist of her hands and lay on top of her so that she could not move. S.S. was laid perpendicular to the toilet within the stall and she hit her head against the wall. S.S. testified that she told Appellant to get off, but did not scream because nobody was around. Appellant subsequently penetrated S.S.'s vagina with his penis. S.S. testified that it hurt and she was crying. S.S. further testified that it was the first time she had sex. S.S. also testified that Appellant had placed a yellow grocery bag on his penis and the bag was already there when he pulled his pants and underpants down.

S.S. estimated that Appellant continued for two minutes. Afterward, Appellant did not help S.S. up and just left her on the ground. S.S. then waited in the bathroom for Appellant to return to the office. S.S. testified that she began crying for approximately five minutes. She subsequently went back to the office and continued to help with the flyers. S.S. stated that she was not crying then and she did not tell anybody what happened. She testified she was too scared to tell anybody. She sat at a table diagonally across from Appellant to continue working on the fliers. They remained at the office for between five and ten minutes before Mr. Wellman took them home.

The following day, S.S. told her friend's mother, Jaime, what had happened. S.S. testified she did not tell anyone sooner than that because she was afraid and did not know what would happen.

---

[5] Brackets within quotation marks in original.

On cross-examination, S.S. denied that she fabricated the allegations of rape because she was made [sic] at how her aunt, M.C., was treating her. Cross-examination focused on whether S.S. perhaps fabricated these allegations against Appellant because his mother, M.C., would not allow S.S. to go to the movies. In fact, S.S. characterized her relationship with her aunt as "pretty decent." S.S. further denied that she had dating [sic] Appellant's half-brother A.C., Jr. Following S.S.'s testimony, the Court recessed.

On September 1, 2015, the Court reconvened. Before the presentation of testimony, the parties stipulated to the admission of Exhibit I. Exhibit I included the curriculum vitae of two experts, Micha Wilpula of the Serology Section of the Erie Regional Laboratory and Dr. Alex Glessner with the Pennsylvania State Police Forensic DNA Division. Importantly, Exhibit I also included the reports of both Ms. Wilpula and Dr. Glessner, which pertained to a serology and forensic DNA testing, respectively, of the plastic bag recovered from the girl's restroom in the Lowe's Building and marked as Exhibit E. The serology report of Ms. Wilpula concluded to a reasonable degree of scientific certainty a positive result of p30, which indicated the presence of semen from a male. Further, the forensic DNA report of Dr. Glessner returned to a reasonable degree of scientific certainty a partial DNA profile that matched the DNA sample of S.S. from the outside of the plastic bag. However, Dr. Glessner could not indicate any finding in regard to the semen located in the plastic bag due to an insufficient quantity of Y chromosome DNA. Consequently, no comparison to the known reference of Appellant was attempted. The stipulation set forth in Exhibit I revealed the yellow grocery bag had S.S.'s DNA and seminal material on it, but it did not have enough Y chromosome to specifically identify Appellant as the source of the semen.

The Commonwealth called as its next witness the affiant, Pennsylvania State Trooper Sean Pierce.

Trooper Pierce testified that he has been stationed at Erie for twelve years and has been a criminal investigator for the past six years. He stated that the alleged incident between Appellant and S.S. occurred on June 21, 2014 and was reported to Pennsylvania State Police on either July 2, 2014 or July 3, 2014.

Subsequently, on July 11, 2014, he attended an interview between S.S. and Michelle Peterson of the Child Advocacy Center. The interview took place solely between S.S. and Ms. Peterson, and Trooper Pierce observed the interview through closed circuit television in a separate room. During the course of the interview, S.S. "identified the location of where the incident occurred and also made [a] statement in regards to a trash bag being possibly used as a [sic] improvised condom."[6] Immediately following the interview, Trooper Pierce went to the Wattsburg Fairgrounds. Trooper Pierce was introduced to Junior Hartner, the fairground president, who took him to the Lowe's building. Trooper Pierce went into the women's restroom and documented the scene with photographs. After photographing the room, Trooper Pierce began to search the garbage can and was informed by Mr. Hartner that each stall had an individual garbage can for feminine products. Trooper Pierce subsequently searched each of those and found a yellow plastic bag within the trash can of the handicapped stall. Trooper Pierce identified Commonwealth's Exhibit K as a torn piece of the yellow plastic bag which was "identified by [S.S.] as being used by [Appellant] [as an] improvised condom."[7] Trooper Pierce described "what looked like [] some type of discharge"[8] inside the bag.

---

[6] Brackets within quotation marks in original.

[7] Brackets within quotation marks in original.

[8] Brackets within quotation marks in original.

Trooper Pierce acknowledged that in between June 21, 2014 and July 22, 2014, a wedding had taken place inside the Lowe's building on June 28, 2014. Trooper Pierce did not know the number of people at the wedding, or whether S.S. was in attendance. He also did not know whether the garbage [can] had been changed after the wedding, but believed it had not been based on his observation that the main trash can was "quite full." However, as revealed in Commonwealth's [Exhibits] J and K, the yellow shopping bag is the only item displayed on top of the garbage can in the handicapped stall, which would indicate that no other items were discarded in this garbage receptacle between the incident and the search.

Trooper Pierce further testified that he interviewed John "Larry" Wellman approximately ten days later and that he interviewed Rosella Fenno approximately twenty days later, on August 4, 2014.

The Commonwealth subsequently called [C.T.], a former neighbor of Appellant and S.S., and who is eighteen years old. [C.T.] testified that she lived at [] Hill Road from approximately 2009 to 2012. She positively identified Appellant on the record as her former neighbor. [C.T.] testified that, during the time she lived nearby, she would often go to Appellant's home to play with S.S. [C.T.] referred to a specific incident in the winter of 2009, shortly after both she moved into the neighborhood and after S.S. had moved in Appellant's home. She, S.S. and Appellant were all eleven years old at the time. [C.T.] testified that she and S.S. were outside playing with Appellant when Appellant and his brother, B.C., began "chasing [her and S.S.] in the snow and tried to dry hump [them]."[9] [C.T.] further explained that Appellant and [B.C.] were "chasing [her and S.S.] and they were trying to tackle [her and S.S.] to the ground."[10] She stated

---

[9] Brackets within quotation marks in original.

[10] Brackets within quotation marks in original.

specifically that Appellant was going after S.S. [C.T.] described that S.S. was on her back, and Appellant was on top of her thrusting as S.S. tried to push him off. Everyone was wearing a snowsuit and a jacket or coat.

[C.T.] stated that S.S. did not cry at all during this incident. [C.T.] acknowledged that she did not tell anyone about the incident after it happened. She explained that she was scared and did not think anyone would believe her. Following [C.T.'s] testimony, the Commonwealth rested.

Subsequently, after the Court conducted a colloquy with Appellant concerning his constitutional rights, Appellant called as his first witness John "Larry" Wellman. Mr. Wellman lives [] across the street from Appellant. He has lived on [that road] since 1956. He stated he has known Appellant and his family for six years, since they moved into the [] residence. He denied knowing Appellant's family from the area prior to them moving across the street. He has served on the Wattsburg Fairgrounds Board of Directors for seven years.

Mr. Wellman testified that the children typically help him at the fairground on different occasions. Specifically, Mr. Wellman would ask Appellant, his brother R.C., and S.S. to help him. He testified that he had asked them to help out twice in June of 2014 and perhaps once in May. He testified that the boys (Appellant and R.C.) had helped him in 2012 and 2013, but S.S.had not.

Mr. Wellman testified that books were printed for the Wattsburg Fair that had errors, so Mr. Wellman asked Appellant, S.S., and Appellant's brother R.C. to help correct those errors on the second occasion in June wherein he brought them to the fairground to help. Mr. Wellman estimated that there were "thousands" of books to correct. Mr. Wellman brought Appellant, S.S. and R.C. to the fairgrounds at about 11:00 a.m. Mr. Wellman left S.S. with Rosella Fenno in the office to correct the

books while he, R.C. and Appellant "were doing other things in the fairgrounds." Mr. Wellman fed them lunch at around 1:00 p.m., and then they all remained in the office correcting the books until approximately 3:00 p.m. At that time, Mr. Wellman left to bring R.C. home so that he could go to the races with his girlfriend. Mr. Wellman explained it takes about twenty minutes to drive to his house from the fairgrounds and back.

When he returned, Rosella was the only one in the office. Approximately, ten to fifteen minutes later, Appellant and S.S. returned to the office. Mr. Wellman stated that "there was no emotion on either one of them that something had happened" and that they "joked around like [] before in the office."[11] He did not notice any indication that S.S. had been crying. A couple hours later, at "roughly 5:00 p.m.," Mr. Wellman returned Appellant and S.S. home where Appellant's parents were outside with some of the other children. Mr. Wellman testified that Appellant and S.S. began kicking a ball around the yard with other children and he then left.

Mr. Wellman testified that neither S.S. nor Appellant worked at the fairgrounds again after that day. Mr. Wellman never stated in his testimony that Appellant's brother, R.C., was living with him at the time. This was later revealed in R.C.'s testimony. Also, Mr. Wellman stated he only knew Appellant's family in a social context over the last six years through working together at the Wattsburg Fairgrounds. However, it was also revealed in testimony that Mr. Wellman knew Appellant's family quite extensively for many years and much longer than the six years testified to by Mr. Wellman.

Appellant next called Rosella Fenno to testify. Ms. Fenno testified that she knew Appellant and a "few" of his family members, but she did not "know them all." She knew Appellant's parents. She knew S.S. from working with her one day. She did not

---

[11] Brackets within quotation marks in original.

know S.S. and referred to her as "the girl, whatever her name is."

She testified that sometime in June, before the Fair, Mr. Wellman, Appellant, R.C. and "the girl" were at the office to put corrections in the fair books. Ms. Fenno stated that they arrived at 8:00 or 9:00 a.m., at the latest before 10:00 a.m. She explained that Mr. Wellman prepared lunch at the Lowe's building, and they left the office to go to the Lowe's building to eat around 12:45 to 1:00 p.m. They subsequently returned to the office and began working on the books again. Mr. Wellman left at about quarter to three to three o'clock to take R.C. home. Ms. Fenno was not sure how long Mr. Wellman was gone because "he was doing some things on the grounds before he came back in the office."

At one point, Appellant and S.S. left to go to the restroom. Ms. Fenno stated that they left to go to the restroom together and that they came back together. Ms. Fenno could not answer how long they were gone but stated "It wasn't extremely long." She testified that the demeanor of Appellant and S.S. was the same as before they left to use the restroom. She did not see any indication that S.S. had been crying. She said they "continued with the job just like [they] did before."[12] She explained that they sat in the same seats they had before lunch, with S.S. sitting across from her and Appellant standing at the end of the table. They continued to work in the office together, and Ms. Fenno was home by 4:00 p.m. She could not say whether she or Mr. Wellman and the children left first.

On cross-examination, Ms. Fenno explained that she had known Appellant and his brother for three or four years. Upon further examination by the Court, Ms. Fenno further explained that Appellant and his brothers had worked at the Wattsburg Fairgrounds for four or five years. She knew

_____
[12] Brackets within quotation marks in original.

Appellant's parents because his father, A.C., Sr. was Director of the Fair at one time. She could not recall which year that was, but acknowledged that Mr. Wellman would have known A.C., Sr. at that point. Ms. Fenno actually had been a Director for the Fair for nine years until the fall of 2014. Ms. Fenno further testified that she, Mr. Wellman and A.C., Sr. all served on the Wattsburg Fairgrounds Board of Directors for a number of years.

Appellant next called his brother, R.C., to testify. R.C. testified that he lives with Mr. Wellman and works at his concession stand. R.C. has volunteered to help with the fair for the past six years. R.C. did not remember the exact day that he went to the fairgrounds with Mr. Wellman, Appellant and S.S. to help fix the books. He did remember that on that day, they arrived at the fairgrounds around 11:00 a.m. R.C. helped with "a couple things around the fairgrounds" before lunch, which occurred around 1:00 p.m., and then they helped with the books after lunch. Mr. Wellman subsequently took him home around 3:00 p.m. so he could go to the races with his girlfriend. At that time, he was living with his parents. He later explained that he moved into Mr. Wellman's house "shortly after this all started." The fact that R.C., the brother of [Appellant], lived with Mr. Wellman was *never* disclosed by Mr. Wellman in his testimony. Clearly, R.C.'s testimony indicated the close relationship Appellant's family had with Mr. Wellman.

R.C. testified that he returned from the races around 11:00 p.m. He did not remember whether Appellant and S.S. were still awake at that time. However, in the days following the assault, R.C. believed "everything was still as normal," and he explained, "I didn't see any difference in [Appellant and S.S.] at all."[13] R.C. denied ever seeing Appellant go into S.S.'s bedroom or stopping Appellant from sexually assaulting her as S.S. previously testified.

---

[13] Brackets within quotation marks in original.

- 11 -

On cross-examination, R.C. acknowledged that he would like to have all of his siblings living together again. However, R.C. stated he would not want S.S. living with them, "not after what she's tried to do to [them]."[14] R.C. further explained that he had known Mr. Wellman longer than six years and that his older brother, S.C., used to work for Mr. Wellman before he did. R.C. also acknowledged that shortly after the incident, S.S. began staying at a friend's house before being removed from his home. R.C. estimated it was two weeks before S.S. was removed from the home.

Appellant next called A.C., Jr. to testify. However, during the course of his testimony, A.C., Jr. made an apparent potentially self-incriminating statement. Out of an abundance of caution and in A.C., Jr.'s interests and to protect his right against self-incrimination, the Court informed him of his constitutional rights and recessed to allow him to seek the advice of counsel before proceeding [with] the testimony. Subsequently, when the Court reconvened on September 3, 2015, Appellant withdrew A.C., Jr. as a witness and his testimony was struck from the record.

Appellant next decided to testify, and the Court found that Appellant knowingly and voluntarily waived his constitutional right to remain silent and not testify. Appellant's parents are A.C., Sr. and M.C. and he has five brothers: S.C., R.C., B.C., A.C. Jr., and J.C. From 2009 to 2014, Appellant also lived with S.S., her sister C.S., and her brother, Z.S. Appellant testified that S.S.'s brother, Z.S., was removed from the home in June of 2014 upon the request of Appellant's parents, A.C., Sr. and M.C.

Appellant subsequently testified concerning the events at the Wattsburg Fairgrounds in June 2014. Mr. Wellman picked Appellant, S.S. and R.C. up and

_____

[14] Brackets within quotation marks in original.

- 12 -

they arrived at the fairgrounds at approximately 11:00 a.m. They dropped S.S. off at the office and then moved barrels, chairs and tables. They subsequently returned to the office to work on the books. They had lunch around 12:45 p.m., and then returned to the office to work on the books again. Mr. Wellman then left to drop R.C. off around 3:00 p.m. S.S. asked Ms. Fenno for permission to use the restroom, which was granted. Ms. Fenno then told Appellant "if you need to do it, do it now." So, a couple seconds after S.S. left, Appellant left to go to the restroom too, and, according to his estimation, S.S. was halfway to the Lowe's building when he left the office. He went to the men's room while S.S. was in the women's room. Appellant stated that he heard Mr. Wellman's truck and "finished up." He knew it was Mr. Wellman's truck because he had known Mr. Wellman for most of his life. When he walked out of the restroom, S.S. was by the tables where they ate lunch and they returned to the office together.

Appellant testified that when they returned to the office, they sat next to each other at the same side of the table. It was approximately 3:30 p.m. and they continued to work on the books until 5:00 p.m., when they left. Mr. Wellman took them home. Appellant stated that his brothers -- S.C., J.C. and B.C. -- and two neighbors were playing soccer in the yard, and that he and S.S. joined them. Appellant testified that the day following the incident, S.S. went to a friend's house. He characterized her demeanor as "the same as any other day."

Appellant denied ever going into the women's restroom and denied sexually assaulting S.S. He denied having a yellow plastic bag and placing it on his penis as a condom to have sex with S.S. He stated there was no sexual intercourse between them, consensual or otherwise. He denied ever seeing S.S. crying or seeing anything that would indicate she had been crying after going to the restroom that day.

Appellant further denied ever going into S.S.'s bedroom without authorization. He denied ever going into S.S.'s room to sexually assault her. He denied ever jumping on her and trying to "dry hump" her while outside playing in the snow when he was twelve.

Appellant further testified that in 2013, when his brother A.C., Jr. was not living with the family, A.C., Jr. and S.S. dated. He stated that his parents, A.C., Sr. and M.C., talked to S.S. about dating A.C., Jr. and grounded her.

Upon examination by the Court, Appellant denied any and all sexual contact with S.S. through the course of his life. Appellant further testified that S.S. had worked at the Wattsburg Fairground three times. He stated that he, R.C., Mr. Wellman, and Ms. Fenno had all worked with S.S. at the fairgrounds previously.

Appellant also testified that there was another person walking his dog at the fairgrounds on the day of the incident. Surprisingly, this was the first time the identity of any other person (other than those witnesses previously mentioned) was stated to be at the Fairgrounds. Appellant stated he did not know his name but he was walking on the other side of the track of the fairgrounds. He saw this other person when he was going to the restroom. He described the other person as tall, with a beard and walking a dog. He believed the dog to have been a German Shepherd. This person was not near the Lowe's building and was on the opposite end of the fairgrounds driveway, walking in the opposite direction. He said he did not know this other person and did not go up to him or say anything to him. Appellant stated the man did not enter the bathroom and no one else every [sic] came into the Lowe's building at the time. He claimed he never saw the other man again. Appellant did not tell Mr. Wellman about this other person, but did tell his father.

Juvenile court opinion, 12/17/15 at 4-17 (citations to delinquency hearing and exhibits omitted).

The record further reflects that after the Commonwealth filed allegations of delinquency against appellant, a delinquency hearing was scheduled before the Honorable Robert A. Sambroak, Jr., for July 20, 2015. On July 13, 2015, appellant filed a motion for discovery, in which he sought reports from the Erie County Office of Children and Youth ("OCY") regarding inculpatory and/or exculpatory statements made by the victim to social workers and/or therapists. On July 14, 2015, Judge Sambroak denied the motion. Thereafter, on July 17, 2015, appellant filed a motion for Judge Sambroak's recusal because, among other things, the judge was assigned to the dependency cases of appellant and three of his brothers, as well as the dependency cases of the victim and two of her siblings. Judge Sambroak granted the recusal motion on July 20, 2015. The case was then reassigned to the Honorable John J. Trucilla, and the delinquency hearing was rescheduled for August 13, 2015.

The record also reflects that following the juvenile court's entry of its dispositional order, appellant filed a timely notice of appeal. The juvenile court then ordered appellant to file a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied. Thereafter, Judge Sambroak filed a supplemental Rule 1925(a) opinion regarding appellant's claim that Judge Sambroak erred in denying appellant's motion

for discovery. The juvenile court incorporated that opinion into its Rule 1925(a) opinion.

Appellant raises the following issues for our review:

A. Whether the Honorable Robert A. Sambroak erred when it denied Appellant's Motion for Discovery and thereby ruled that Appellant was not entitled to a copy of and/or a review of reports and/or statements made to the Office of Children & Youth (OCY) by the victim, as Appellant needed those documents to prepare a proper cross-examination of the victim during the trial, and that said ruling violated Appellant's rights under the Constitutions of the United States and the Commonwealth of Pennsylvania[?]

B. Whether the verdict goes against the sufficiency of the evidence because (a) the victim's immediate post-reaction to the alleged sexual assault was not an honest and truthful response to the alleged actions and/or the victim's testimony supports the proffered testimony of the Appellant's witnesses in that the victim did not act any differently from her normal actions; and (b) the victim's statement and/or testimony included a statement that the Appellant used a plastic bag as a condom because he did not have a condom on his person denotes a familiarity and/or knowledge of Appellant's sexual tendencies when such familiarity and/or knowledge goes against the facts of the allegations[?]

C. Whether the verdict goes against the weight of the evidence because the Commonwealth's primary witnesses, the victim and her friend, contradicted themselves [on] multiple occasions on factual matters and that those factual matters were a substantial deviation from what the Commonwealth alleged happened, and therefore the Commonwealth

cannot present any credible witnesses with actual knowledge and/or information and/or the Commonwealth cannot meet the beyond a reasonable doubt burden of proof[?]

D.  Whether the [juvenile court] erred at time of trial by not allowing any testimony from the Appellant and/or other witnesses that would have allowed the [juvenile] court to hear Res Gestae evidence germane to the Appellant's background and/or character and/or germane to the relationship between the Appellant and the victim[?]

E.  Whether the [juvenile court] erred at time of trial by not allowing the Appellant to present a closing statement prior [to] the [juvenile] court's ruling as the trial involved a complicated and/or sensitive fact pattern and/or approximately seven (7) witnesses over a three (3) day period[?]

F.  Whether the [juvenile court] erred at time of trial when the [juvenile] court ruled that all of Appellant's witnesses, including Appellant, were not credible in toto despite the strong similarities between the testimonies of the victim and Appellant's witnesses and/or the lack of any motivation and/or other reason to provide untruthful testimony before the [juvenile] court[?]

Appellant's brief at 3-4.

"The Juvenile Act grants juvenile courts broad discretion when determining an appropriate disposition. . . . We will disturb a juvenile court's disposition only upon a showing of a manifest abuse of discretion." *Interest of C.A.G.*, 89 A.3d 704, 709 (Pa.Super. 2014) (citations omitted). Our supreme court has held that an adjudication of delinquency requires

both findings "(1) that the juvenile has committed a delinquent act; and (2) that the juvenile is in need of treatment, supervision, or rehabilitation." *Commonwealth v. M.W.*, 39 A.3d 958, 959 (Pa. 2012),

In his first issue, appellant complains that Judge Sambroak erred in denying appellant's motion for discovery of reports and/or statements that the victim made to OCY because appellant needed those documents to prepare a proper cross-examination of the victim. (Appellant's brief at 8.)

In denying appellant's discovery motion, Judge Sambroak first determined that the records appellant sought constituted confidential reports pursuant to 23 Pa.C.S.A. § 6340. Appellant does not dispute that determination, but claims that he had "anticipated that [Judge Sambroak] would have conducted an *en* [sic] *camera*, pursuant [to] [Section] 6340, which proves [sic] in part that specific, confidential reports regarding alleged incidents of child abuse or sexual abuse 'shall only be made available to, among others, "a court of competent jurisdiction."'" (Appellant's brief at 10.) Judge Sambroak, however, did not conduct an *in camera* review. Rather, Judge Sambroak denied appellant's request as untimely and deemed it "as a last minute attempt to delay the denial[15] hearing." (Supplemental Rule 1925(a) opinion, 11/23/15 at 2-3.) Judge Sambroak also noted that because appellant knew that the documents existed from the inception of

---

[15] Erie County trial courts oftentimes refer to a delinquency hearing as a denial hearing.

- 18 -

the dependency case, appellant could have sought discovery at an earlier date. (*Id.* at 3.)

Regarding the relevant timeline, the record reflects that appellant was charged with seven allegations of delinquency on January 27, 2015, and his adjudicatory hearing was scheduled for July 20, 2015. In his brief to this court, appellant's counsel states that he met appellant for the first time at appellant's status conference on April 10, 2015. (Appellant's brief at 8.) On July 13, 2015, which was three months after the status conference and one week prior to the scheduled delinquency hearing, appellant filed his motion for discovery. Judge Sambroak denied the discovery motion, without an opinion, by order docketed July 14, 2015. On July 17, 2015, appellant then moved for Judge Sambroak's recusal, and Judge Sambroak recused himself on July 20, 2015. Appellant's adjudication was then transferred to Judge Trucilla and appellant's delinquency hearing was rescheduled for August 13, 2015. We note that despite Judge Sambroak's grant of appellant's motion for recusal, appellant did not file any discovery motions with Judge Trucilla, who was reassigned to appellant's adjudication.

In his brief, appellant offers no explanation as to why he filed his discovery motion a week before the scheduled delinquency hearing that was to take place before Judge Sambroak. Rather, appellant relies on Pa.R.J.C.P. 347(a) to justify the timing of his filing of that motion. Rule 347(a) provides that an "omnibus motion shall be made as soon as

practical but can be made at any time prior to the calling of the first witness at the adjudicatory hearing." Appellant, however, filed a discovery motion. Pa.R.J.C.P. 340(a) governs pre-adjudicatory discovery and provides that a discovery motion "shall be made as soon as possible prior to the adjudicatory hearing." Here, Judge Sambroak denied the motion after finding it untimely, as well as a last-minute attempt to delay the hearing. Judge Sambroak further noted that appellant could have sought discovery at an earlier date. Appellant fails to demonstrate otherwise. As such, we find no abuse of discretion.

In his second complaint, appellant attempts to raise a sufficiency of the evidence claim by challenging the testimony regarding the victim's reaction after the assault, as well as her knowledge of the purpose of a condom. (Appellant's brief at 21-25.) It is well settled that when challenging the sufficiency of the evidence on appeal, that in order to preserve that issue for appeal, an appellant's Rule 1925(b) statement must specify the element or elements upon which the evidence was insufficient. ***Commonwealth v. Gibbs***, 981 A.2d 274, 281 (Pa.Super. 2009), ***appeal denied***, 3 A.3d 670 (Pa. 2010) (citation and internal quotation marks omitted); ***see also In re J.G.***, 145 A.3d 1179, 1189 (Pa.Super. 2016).

Here, in his Rule 1925(b) statement, appellant frames his sufficiency challenge in the identical manner that he frames his sufficiency claim in his appellate brief. (Concise statement of matters complained of on appeal,

11/12/15 at 2, ¶ 2.) Appellant's sufficiency claim as set forth in his Rule 1925(b) statement fails to identify which element or elements of any of the crimes of which he was adjudicated delinquent were insufficient. Additionally, although appellant attempts to challenge the sufficiency of the evidence, he does nothing more than raise a weight of the evidence challenge because his argument attacks the victim's reliability. Therefore, appellant's complaint goes to the weight of the evidence, not its sufficiency. *See Commonwealth v. Wilson*, 825 A.2d 710, 713-714 (Pa.Super. 2003) (a review of the sufficiency of the evidence does not include a credibility assessment; such a claim goes to the weight of the evidence); *Commonwealth v. Gaskins*, 692 A.2d 224, 227 (Pa.Super. 1997) (the fact-finder makes credibility determinations, and challenges to those determinations go to the weight of the evidence, not the sufficiency of the evidence).

Appellant also challenges the weight of the evidence in his third issue, claiming that the "Commonwealth's primary witnesses, the victim and her friend, contradicted themselves" and that the Commonwealth was unable to present any credible witnesses. (Appellant's brief at 3, 21-26.) In his sixth issue, appellant challenges all of the juvenile court's credibility determinations. (*Id.* at 26-32.) We will, therefore, address the weight challenges that appellant presents in his second, third, and sixth claims together.

This [c]ourt applies the same standard for reviewing weight of the evidence claims in juvenile cases as those involving adults. *In re R.N.*, 951 A.2d 363, 370 (Pa.Super.2008), called into question on other grounds, *In re J.B.*, 630 Pa. 124, 106 A.3d 76 (2014). An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Ramtahal*, 613 Pa. 316, 33 A.3d 602 (2011). "An appellate court, therefore, reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence." *Id.*, 613 Pa. at 327-28, 33 A.3d at 609. Moreover, a court's denial of a motion for a new trial based upon a weight of the evidence claim is the least assailable of its rulings. *Commonwealth v. Rivera*, 603 Pa. 340, 363, 983 A.2d 1211, 1225 (2009).

While the comment to Pa.R.Crim.P. 607(A) specifies that weight of the evidence claims in criminal proceedings are waived unless they are raised with the trial court in a motion for a new trial, "the Pennsylvania Rules of Juvenile Procedure have no counterpart requiring the same manner of preservation." *In re J.B.*, 630 Pa. 124, 149, 106 A.3d 76, 91 (2014). Indeed, "the current Rules of Juvenile Court Procedure—which 'govern delinquency proceedings in all courts'—are utterly silent as to how a weight of the evidence claim must be presented to the juvenile court so that it may rule on the claim in the first instance, which is . . . a necessary prerequisite for appellate review." *Id.*, 630 Pa. at 160, 106 A.3d at 98 (footnote omitted). Pa.R.J.C.P. 620(A)(2) governs the filing of what it expressly designates as an "optional post-dispositional motion." See Pa.R.J.C.P. 620(A)(2) ("Issues raised before or during the adjudicatory hearing shall be deemed preserved for appeal whether or not the party elects to file a post-dispositional motion on those issues").

*In re J.G.*, 145 A.3d at 1187.

Here, appellant did not file an optional post-dispositional motion pursuant to Pa.R.J.C.P. 620 alleging that the verdict was against the weight of the evidence, and he failed to raise such a challenge prior to the juvenile court's entry of its dispositional order. Appellant presented his weight of the evidence claims for the first time in his Pa.R.A.P. 1925(b) statement. The juvenile court, however, considered the merits of appellant's weight challenges in its Pa.R.A.P. 1925(a) opinion. (Juvenile court opinion, 12/17/15 at 5-6.) We will, therefore, address appellant's weight claims on the merits.

Appellant's challenges to the weight of the evidence do nothing more than invite this court to assess witness credibility and reweigh the evidence. Appellant maintains that the Commonwealth witnesses were unreliable and that appellant and his witnesses were reliable. Appellant dedicates 12 pages of his brief reiterating testimony and attempting to point out inconsistencies in the testimony of the Commonwealth witnesses and consistencies in the testimony of appellant and his witnesses. (Appellant's brief at 21-32.) The juvenile court, however, as fact-finder, had the duty to determine the credibility of the testimony and evidence presented at the adjudication. **See Commonwealth v. Talbert**, 129 A.3d 536, 546 (Pa.Super. 2013).

Here, the juvenile court concluded, as it was free to do, that "the Commonwealth's witnesses, particularly [the victim,] [were] fully credible" and that the collective testimony of appellant's witnesses "had an almost

J. S83003/16

rehearsed ring to it" in that they "testified in the same minimizing and protective way for [a]ppellant." (Juvenile court opinion, 12/17/15 at 30-31.) Our review of the record supports the conclusion that the evidence resulting in appellant's adjudications of delinquency was not so tenuous, vague, and uncertain so as to shock the conscience of the court. *See Talbert*, 129 A.3d at 546 (restating the rule of law that "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, 'the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court.'"). Therefore, the juvenile court properly exercised its discretion, and appellant's challenges to the weight of the evidence necessarily fail.

Appellant next complains that the "[juvenile] court could have or should have allowed Res Gestae evidence during the denial hearing" "with regards to cross[-]examination of the [v]ictim." (Appellant's brief at 32.) The crux of appellant's six-sentence argument on this issue is that he was unable to effectively cross-examine the victim because Judge Sambroak denied his discovery motion. Indeed, appellant maintains that "[a]s this issue closely relates to [a]ppellant's issue regarding the Motion for Discovery, [a]ppellant hereby incorporates that argument as if restated in full." (*Id.* at 33.) We addressed appellant's meritless claim concerning Judge Sambroak's denial of appellant's discovery motion in issue one, and we will not reiterate it here.

Appellant finally complains that "the [juvenile] court could have or should have allowed [a]ppellant to present a closing statement." (*Id*.) The record reflects that appellant did not request the opportunity to make a closing statement before or during the adjudicatory hearing.[16] The record further reflects that appellant did not file a post-dispositional motion.[17] Therefore, because appellant raises this issue for the first time on appeal, it is deemed waived. *See* Pa.R.A.P. 302(a) ("[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

Dispositional order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/22/2016

---

[16] The Rules of Juvenile Court Procedure do not provide the parties with the right to make a closing statement in an adjudicatory proceeding. *See* Pa.R.J.C.P. 406(A) (requiring the court to "conduct the adjudicatory hearing without a jury, in an informal but orderly manner").

[17] Pa.R.J.C.P. 620(A)(1) affords the parties the right to make a post-dispositional motion. Pa.R.J.C.P. 620(A)(2) provides that "[i]ssues raised before or during the adjudicatory hearing shall be deemed preserved for appeal whether or not the party elects to file a post-dispositional motion on those issues."