J-S60041-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                        :           PENNSYLVANIA
                        :
           v.              :
                        :
                        :
ANTHONY RIVERA            :
                        :
         Appellant      :   No. 824 MDA 2019

Appeal from the Judgment of Sentence Entered April 8, 2019
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0003031-2016

BEFORE:  SHOGAN, J., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:        **FILED NOVEMBER 26, 2019**

Anthony Rivera (Rivera) appeals from the judgment of sentence entered on April 8, 2019, by the Court of Common Pleas of Berks County (trial court) following his convictions for aggravated assault, rape, sexual assault, terroristic threats, possessing instruments of crime, and two counts of simple assault.[1]  Rivera challenges the sufficiency of the evidence to sustain his aggravated assault conviction and contends that all of his convictions were against the weight of the evidence.  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2702(a)(1), 3121(a)(1), 3124.1, 2706, 907(a), 2701(a)(1), 2701(a)(3).

**I.**

The trial court summarized the facts of this case as follows:

After a tumultuous year-and-a-half, Rita Rivera ("the Victim") and Appellant ended their romantic relationship in 2016, but the two remained in contact. (Notes of Testimony of Trial from November 27-28, 2018 "N.T." at 62-65). Therefore, when on or about April 23, 2016, the Victim was awoken from sleep to someone knocking on the front door of her Chestnut Street apartment in the City of Reading, and she recognized Defendant as the person knocking, she opened the door, thinking that Defendant merely wanted to talk. (N.T. 65-68). Unfortunately, when the Victim opened the door, Appellant pushed the door in and forced his way into the apartment. (N.T. 66-68). Appellant then pushed the Victim toward her bedroom and told the Victim that he was coming to kill her. (N.T. 68).

Arriving at the bedroom, the two began to struggle and Appellant then took out a ten-inch knife from a cart that he had with him, put it to the Victim's face and told her that he would slash her throat. (N.T. 69-70). On the bed, Appellant was situated on top of the Victim with his knees in her back and his hands holding her shoulder and neck. (N.T. 72). Appellant began to punch the Victim in the face and repeatedly told her that he was going to kill her. (N.T. 71-72). Appellant demanded that the Victim close her eyes and told her that he had a gun, though the Victim never actually saw the gun. (N.T. 73).

After telling the Victim that he wanted to rape her, Appellant then pulled down the Victim's pants and underwear, proceeded to rape the Victim and then rubbed ejaculate onto her face. (N.T. 73). Appellant punched the Victim in the jaw in order to force her mouth open, then poured what the Victim believed to be fabric softener into her mouth and began choking her. (N.T. 74). During the continuing struggle, the Victim was able to turn her face to the side and spit the substance out onto the floor and she and Appellant continued to struggle. *Id.*

Appellant abruptly sat back and started crying. (N.T. 76). In an attempt to calm the situation and to quell any suspicions of Appellant that she might become aggressive, the Victim offered to make Appellant coffee.[8] (N.T. 77). However, Appellant refused and forced the Victim to accompany him to Appellant's apartment,

- 2 -

which was several blocks away. (N.T. 77-78). When the Victim attempted to resist, stating that she would scream along the way, Appellant reiterated threats that he had a gun, a knife, a stick and other tools in his cart. (N.T. 77).

[8] The Victim explained that she was alone, confused and without energy and scared that if she appeared aggressive, Appellant would reengage the assault. (N.T. 76-77).

Reaching Appellant's apartment, Appellant gave the Victim some pills that rendered her unconscious. (N.T. 78). On Sunday, when the Victim awoke, she hurriedly dressed and left Appellant's apartment, but Appellant followed her and grabbed the Victim's shoulders, attempting to restrain her. (N.T. 79-80). A neighbor then emerged from an adjoining apartment and asked if the Victim was okay. *Id.* With the concerned neighbor providing an opportunity for the Victim to get away, the Victim ran into the elevator and left the building. (N.T. 80). A few days later, the Victim called police because Appellant continued to threaten her. *Id.*

On April 26, 2018, Officer Christopher Bucklin responded to a call at 720 Chestnut Street in the City of Reading to meet with a reported assault victim. (N.T. 123). When Officer Bucklin arrived, he met with the Victim and noticed discoloration on the Victim's face and signs of physical and emotional trauma, including fragmented thoughts, frequent weeping and genuine fear. (N.T. 124-26). Officer Bucklin received the Victim's account, which was consistent with the injuries he observed, and began taking photographs of the room where the assault took place. (N.T. 124-25).

\*\*\*

Officer Bucklin testified that a search warrant was issued and executed on Defendant's residence. (N.T. 135). During the search of Defendant's apartment, the black cart described by the Victim was found. (N.T. 136). On the black cart, a green back [sic] was found, which contained a blue bottle of fabric softener. (N.T. 137). Two knives were also found in Defendant's apartment. (N.T. 137-39).

The Victim was taken to the Reading Hospital emergency room where she was assessed by a nurse specializing in sexual assault examinations. (N.T. 113-14). The Victim reported to the nurse that she had been held hostage in her apartment by an ex-boyfriend who had a knife and gun, held the Victim down and made her drink laundry detergent. (N.T. 116). After interviewing the Victim, the nurse performed an examination of the Victim in order to collect various swab specimens. (N.T. 116-17). The nurse indicated that no internal trauma was detected, but cautioned that she has observed allegations of forcible rape in which there is no internal trauma. (N.T. 117). However, the nurse did indicate that she observed signs of physical trauma on the Victim including discoloration on the Victim's head and cuts on the Victim's lip and left calf. (N.T. 117-18).

Trial court opinion, 7/15/19, at unnumbered 1-4.

Rivera proceeded to a jury trial. At trial, the Commonwealth and Rivera stipulated that no seminal material was found in any of the swabs taken during the Victim's rape kit. (N.T. at 149). However, DNA analysis identified the Victim's blood on two pillowcases and a blanket. (N.T. at 149-50). Spermatozoa found on a pillowcase and a blanket matched Rivera's DNA. (N.T. at 149-51).

The jury found Rivera guilty of the above-mentioned offenses. The trial court sentenced Rivera to an aggregate term of 13 to 35 years of incarceration. He filed a timely post-sentence motion, which the trial court denied. Rivera then timely filed a notice of appeal and both he and the trial court complied with Rule 1925.[2]

---

[2] Our standard of review is well-settled:

**II.**

Rivera first contends that the evidence was insufficient to sustain his conviction for aggravated assault because the Victim did not suffer serious bodily injury nor did Commonwealth introduce sufficient evidence that he attempted to cause serious bodily injury. In making this argument, he relies upon **Commonwealth v. Alexander**, 383 A.2d 887 (Pa. 1978), for the principle that when serious bodily injury does not result, the Commonwealth must prove intent to cause serious bodily injury to support a conviction for aggravated assault.

---

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [this] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

**Commonwealth v. Lopez**, 57 A.3d 74, 79 (Pa. Super. 2012) (citation omitted).

A defendant may be convicted of aggravated assault if he "attempts to cause serious bodily injury to another. . . ."  18 Pa.C.S. § 2702(a)(1).  The Crimes Code defines "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."  18 Pa.C.S. § 2301.  Intent to commit aggravated assault may be proven by circumstantial evidence or inferred from the totality of the circumstances of the offense.  *Commonwealth v. Palmer*, 192 A.3d 85, 96 (Pa. Super. 2018).  Moreover, "the jury [is] permitted to attach significance to the natural and probable outcome of [a defendant's] behavior when assessing intent."  *Id.*

In *Alexander*, our Supreme Court held that a single punch to the victim's head was not sufficient to infer that the defendant had intended to cause serious bodily injury.  383 A.2d at 889.  Rivera also cites *Commonwealth v. Savage*, 418 A.2d 629, 632 (Pa. Super. 1980), and *Commonwealth v. Mayo*, 414 A.2d 696 (Pa. Super. 1979), for the propositions that pointing a gun at a victim or scratching a victim with a knife without drawing blood are not sufficient to establish an intent to cause serious bodily injury.[3]  Rivera's claim is based on the premise that each individual part

---

[3] We note that in *Mayo*, the defendant was charged with aggravated assault with a deadly weapon, which required proof of intent to cause "bodily injury" instead of "serious bodily injury."  *Commonwealth v. Mayo*, 414 A.2d 696,

of the attack would not be sufficient to support his aggravated assault conviction. However, in evaluating the sufficiency of the evidence, we assess the totality of the circumstances to determine whether intent was proven beyond a reasonable doubt. ***Palmer***, ***supra***.

Viewing the record in the light most favorable to the Commonwealth, it is clear that the totality of the circumstances of the lengthy attack supports the jury's finding that Rivera intended to cause serious bodily injury. The Victim's testimony established that Rivera did not throw a single punch and walk away; rather, he repeatedly punched her in the face, held a knife to her throat, and forced fabric softener into her mouth while choking her. (N.T. at 69-72, 74, 89-90). He also knew that one of the Victim's arms was weak and repeatedly struck that arm to make it harder for her to resist the attack. (N.T. at 72, 89). The attack lasted approximately 45 minutes, and Rivera repeatedly told the Victim that he would kill her. (N.T. at 71-72, 88). While the Victim managed to avoid swallowing the fabric softener by spitting it out on her floor, the jury was entitled to conclude that Rivera intended to inflict serious bodily injury and such injury could have resulted when Rivera forced those chemicals into the Victim's mouth while choking her.

_____

702 (Pa. Super. 1979). Relevant to Rivera's claim, however, is our court's analysis of the defendant's intent to cause bodily injury, not simply the type of injury that resulted.

- 7 -

**III.**

Next, Rivera contends that he is entitled to a new trial because the guilty verdicts for all of the charges were against the weight of the evidence.[4]  He argues that the Victim's testimony was incredible, as there were inconsistencies between the events as she recounted them at trial and when she initially described the attack to Officer Bucklin, her co-worker and the nurse who performed her rape kit.  Moreover, he argues that the physical evidence does not corroborate the Victim's version of events.  We discern no abuse of the trial court's discretion.

"An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court." ***Commonwealth v. Sullivan***, 820 A.2d 795, 805-06 (Pa. Super. 2003) (citation omitted).  However, "[t]he trial court will only award a new trial when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." ***Commonwealth v. Olsen***, 82 A.3d 1041, 1049 (Pa. Super. 2013) (citation omitted).  To meet this high

---

[4] When evaluating a challenge to the weight of the evidence to support a conviction, this court does not reweigh the evidence presented at trial, but rather evaluates the trial court's denial of the motion for new trial for an abuse of discretion. ***Commonwealth v. Clay***, 64 A.3d 1049, 1054-55 (Pa. 2013). An abuse of discretion occurs "where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will." ***Id.*** (citation omitted).  A trial court's determination that the verdict was not against the weight of the evidence is "[o]ne of the least assailable reasons for granting a new trial." ***Id.*** (citation omitted).

burden, "the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." ***Commonwealth v. Akhmedov***, 3443 EDA 2015, at \*26 (Pa. Super. July 29, 2019) (*en banc*) (citation omitted). In evaluating the verdict, this court does not independently assess the credibility of the evidence, as this is purely within the province of the fact-finder. ***Olsen***, ***supra***.

Rivera's argument is principally based upon discrepancies in the Victim's testimony at trial and the versions of events that she recounted to Officer Bucklin, her co-worker, and the nurse who performed her rape kit. ***See*** Rivera's Brief at 45. He argues that these three witnesses testified credibly, but the Victim had told a different story to each of them immediately after the events. ***Id.*** The discrepancies concern how the Victim ended up at Rivera's apartment after leaving her own, how long she was at each scene, and which particular acts took place at each apartment. ***Id.*** at 48-49. He also points out that the Victim did not immediately tell Officer Bucklin or the nurse that she had been drugged by Rivera. ***Id.*** Further, the parties stipulated that the samples of the fabric softener that were recovered from the floor in the Victim's apartment did not match the fabric softener found at Rivera's apartment. ***Id.*** at 50. He also argues that the evidence collected for the purposes of the rape kit did not reveal any internal trauma or seminal material on the Victim's person, and that her bruising and cut lip were inconsistent with the severity of the attack she described. ***Id.*** at 51, 54-55. Finally, he points

out that forensic testimony did not reveal any DNA on the knives recovered from Rivera's apartment, even though the Victim testified that Rivera had pressed one of the knives to her throat during the attack. *Id.* at 56.

After careful review of the record, we agree with the trial court that the discrepancies that Rivera has identified in the Victim's testimony are minor, and it was the proper function of the jury to resolve those discrepancies when making credibility determinations. Trial court opinion, 7/15/19, at unnumbered 10; *Commonwealth v. Ramtahal*, 33 A.3d 602, 609 (Pa. 2011) (citations omitted). Further, while the rape kit did not reveal any internal trauma or Rivera's DNA, the jury could have credited the nurse's testimony that forcible rape does not always result in physical trauma, and that enough time had passed between the assault and the rape kit to eliminate any DNA evidence. (N.T. at 117, 120-21). The Victim's testimony and the photos taken of her injuries days after the assault further support the jury's verdict. Finally, even though no DNA was found on the knives and the fabric softener recovered from Rivera's home did not match that at the Victim's apartment, the jury was entitled to weigh the testimony and conclude that a knife and fabric softener had been used in the attack. The trial court's conclusions on these matters are well supported by the record, and it did not abuse its discretion in rejecting Rivera's challenge to the weight of the evidence and denying his motion for a new trial.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>11/26/2019</u>