J. S31040/20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| VICTOR MANUEL GONZALEZ-LOPEZ, | : | No. 1776 MDA 2019 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence Entered September 17, 2019,
in the Court of Common Pleas of Dauphin County
Criminal Division at No. CP-22-CR-0006754-2017

BEFORE:  BOWES, J., DUBOW, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED SEPTEMBER 24, 2020**

Victor Manuel Gonzalez-Lopez appeals from the September 17, 2019 judgment of sentence entered by the Court of Common Pleas of Dauphin County following his conviction of aggravated assault, possession of a firearm by a prohibited person, discharge of a firearm into an occupied structure, and recklessly endangering another person.[1]  The trial court sentenced appellant to an aggregate term of 6-16 years' imprisonment.  After careful review, we affirm.

The trial court provided the following factual history:

> Ivette Patricia Erazo [("Erazo")] testified that she met [appellant] in 2015.  After going through a separation/divorce, [Erazo] and her daughter Alejandra ("Ally") found a home to rent and needed a roommate to share the costs.  [Appellant] moved in

---

[1] 18 Pa.C.S.A. §§ 2702(a)(4), 6105(a)(1), 2707.1(a), and 2705, respectively.

with [Erazo] and Ally[,] and he and [Erazo] started dating in September of 2015. After a few weeks, [appellant] had trust issues with [Erazo], accusing her of seeing other men, including her ex-husband. He told [Erazo] that he would move out if she gave him $5,000 to leave. [Erazo] did not give [appellant] the money; instead, she and Ally moved out. In November of 2015, [appellant] repeatedly called [Erazo] and she agreed to talk. [Appellant] convinced her that he was drunk the night that he asked her for money, that he did not want to lose her, and that he was sorry. Afterwards, [appellant, Erazo,] and Ally moved in together again and rented an apartment at 3414 Walnut Street. [Erazo] also testified that Ally did not approve of the reconciliation.

On January 9, 2016, the Susquehanna Township Police Department was called after [Erazo] was physically abused by [appellant]. She testified that he hit her all over her body, put his hands on her neck, pushed her against a wall, and caused damage to the wall. Following this incident, on January 11, 2016, [Erazo] filed for a protection from abuse (["]PFA["]) order. However, because [appellant] again convinced [Erazo] that he was drunk and did not want to lose her, the PFA was withdrawn and dismissed. [Erazo] testified that during the relationship, [appellant] had a list of rules. She could not visit neighbors, could not have friends over, could not use her phone unless she was in [appellant's] presence, could only go shopping if [appellant] accompanied her, and could not talk to other men. [Appellant] began hitting [Erazo] again, and was verbally abusive, even after he took classes for anger management. [Erazo] ended the relationship again in April of 2017. A petition for a PFA was filed against [appellant] on May 1, 2017, and was granted on May 9, 2017. [Appellant] continued to text [Erazo] with messages threatening to kill himself, that he couldn't live without her, and apologies. [Erazo] asked him to stop contacting her, but agreed to remain friends. After refusing to date [appellant] again, [Erazo] received threatening texts, and [appellant] took the license plate off of her car and did not return it. [Erazo] filed for another PFA on

August 9, 2017, because [appellant] continued to threaten her, scare her, and follow her around. The PFA order became effective on September 12, 2017, and such order included a provision for [appellant] to relinquish weapons. While the September 12th PFA order was in effect, [Erazo] discovered that sugar had been poured into the gas tank of her car, prompting her to purchase a camera that she hid on the porch of her home.

On the evening of October 8, 2017, [Erazo] was at home in her bedroom watching TV on her phone. Her daughter Ally was out, and [Erazo] heard her come in at around 12:30 a.m. At 12:28 a.m., [Erazo] heard an "explosion . . . . like someone was shooting at the house." The camera captured the explosion. [Erazo] jumped out of bed and went directly to Ally's room. Ally's leg had a red mark on it that was left by a bullet.

Ally Erazo also testified at trial. She stated that [appellant] mistreated [Erazo], tried to use extortion to end the relationship, and that she asked [appellant] to move out. On the evening of October 8, 2017, Ally came home from a friend's house at approximately 12:30 a.m., entered her home via the front porch, and went into her bedroom, which was on the second floor in the front with the window facing the street. She turned on the lights, put her shoes and coat in her closet, turned off the light, and went to her bed. Seconds after taking her phone out, Ally heard a loud noise and thought her window air conditioning unit had fallen. At that point[,] her leg started burning and she discovered that a bullet had fallen on her and was hot. She realized that the bullet had come from outside, through her closet door, right where she had been standing just moments before. When Ally realized it was a gunshot, she got to the ground and called the police. At the same time, [Erazo] was knocking at her door and Ally told her to get down when she let her mom in.

As testified to by Detective James Glucksman of the Lower Paxton Township Police Department, [appellant's] path on the evening of the shooting was

evidenced by his cell phone records. Detective Glucksman created a map to show the distance of the closest cell tower to the location of the crime. There was a tower 155 feet away from [Erazo] and Ally's residence, and on the night in question, [appellant's] phone connected to that tower approximately 3½ hours before the shooting. At 12:09 a.m. that evening, [appellant] received a cell phone call but it did not connect to any towers – meaning that the phone was off or in an area of no reception. At 1:33 a.m., [appellant's] cellphone connected to a tower directly next to the Nuevo Mexico restaurant. An employee of Nuevo Mexico, Ali Cordova, testified that [appellant] came into the restaurant on October 8, 2017 after 1:00 a.m.

Officer Joshua Reager of the Highspire Police Department received a dispatch just before 1:00 a.m. on October 8, 2017, asking to locate [appellant], who lived at 105 Roop Street in the Borough of Highspire with his sister. Officer Reager and other officers arrived at the Roop Street address about 15 minutes after the dispatch. [Appellant] was not there, but his sister, Carmen Gonzalez, was home and gave the officers permission to search the house. [Appellant] did not return home until approximately 1:45 a.m.

Testimony was also presented regarding [appellant's] gun possession/ownership. According to Sergeant Darin Sherfey of the Dauphin County Sheriff's Office, [appellant] completed an affidavit of non-ownership of a firearm in October of 2017. For PFA purposes, the affidavit explains that a person . . . cannot possess or own any firearms or a gun permit. Kenneth Glasgow, a Bass Pro Shop employee who also offered testimony at trial, averred that there are records showing that on April 13, 2017, [appellant] purchased a .40 caliber Ruger firearm. Notably, it was stipulated by the parties at trial that the bullet collected from Ally's bedroom at 3414 Walnut Street was a .40 caliber, 10 millimeter class bullet.[Footnote 1]

[Footnote 1] The bullet, Commonwealth Exhibit 34, was received and analyzed by Trooper Todd Neumeyer. Based on the caliber, rifling, and twist of the .40 caliber bullet, Trooper Neumeyer compiled a list of 13 manufacturers that could have created the gun that fired the bullet, one of which was Ruger. Because a gun was never submitted to Trooper Neumyer [sic] for comparison, he was not able to identify the specific gun that fired the bullet.

Forensic scientist Albert Lattanzi, Jr. of the Pennsylvania State Police Bureau of Forensic Services testified in his capacity as an expert in gunshot residue. In November of 2017, Mr. Lattanzi received a [gunshot] residue kit containing samples from [appellant's] palms after his apprehension. The analysis revealed that all three elements of gunshot residue were found in the samples taken from [appellant's] right back, left palm, and left back areas. Mr. Lattanzi's opinion was that [appellant] may have either handled or discharged a firearm, was in close proximity to a firearm when it was fired, or may have come into contact with an object that had gun residue on it.

Warren Mayo met [appellant] in prison, and also offered testimony at trial. At the time of trial Mr. Mayo was on probation. In the past he had pled guilty of theft by unlawful taking, theft by deception, and retail theft. In July of 2018, Mr. Mayo approached the Susquehanna Township Police Department with information about [appellant], and provided a statement the following month. After Mr. Mayo and [appellant] befriended one another and [appellant] became comfortable opening up to Mr. Mayo, he started talking about his case. He told Mr. Mayo that he shot through the home of his ex-girlfriend. Specifically, Mr. Mayo testified that [appellant] told him he was familiar with the house, knew where the camera was, and said it was impossible for anyone to see him because he stayed at a certain angle and shot

- 5 -

up through the house. [Appellant] also shared that it was dark, and he parked his car in some gravel near some school buses. He told Mr. Mayo how "dumb" [Erazo] and Ally were, and mentioned that he "rolled right by the daughter going into the house" and she looked right in his direction and didn't even see him. He also referred to [Erazo] as "the bitch and her daughter." [Appellant] referred to Ally in an angry manner and indicated they did not get along.

Not only did [appellant] deny owning a firearm, but his story regarding the evening of the crime changed depending on who was interviewing him. This was demonstrated by testimony given by Detective Darryl Brown and Lieutenant Frances Done.

Trial court opinion, 2/11/20 at 1-6 (citations to the record omitted).

A jury convicted appellant of the aforementioned offenses on July 12, 2019. On September 17, 2019, the trial court imposed its sentence. Appellant filed a post-sentence motion on September 26, 2019, which the trial court denied on October 3, 2019.

On October 28, 2019, appellant filed a timely notice of appeal. The trial court ordered appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and appellant timely complied. On February 11, 2020, the trial court filed an opinion pursuant to Pa.R.A.P. 1925(a).

Appellant raises the following issues for our review:

> I. Was not the evidence insufficient to sustain a conviction for aggravated assault under 18 Pa.C.S.[A.] § 2702(a)(4) when the complainant did not suffer bodily injury and when the evidence was insufficient to show that [appellant] attempted to cause bodily injury?

II.     Did not the lower court abuse its discretion by failing to grant [appellant] a new trial on the basis that the guilty verdicts on all charges were against the weight of the evidence when the totality of the evidence regarding [appellant's] identity as the perpetrator of the crimes was unreliable, contradictory, and incredible?

Appellant's brief at 6 (full capitalization omitted).

Appellant first contends that the Commonwealth brought forth sufficient evidence to warrant his conviction of aggravated assault. Specifically, appellant argues that the Commonwealth failed to establish beyond a reasonable doubt that appellant attempted to cause bodily injury. (*Id.* at 26.)

Our standard of review for sufficiency of the evidence claims is well settled:

As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, [t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.
>
> ***Commonwealth v. Franklin***, 69 A.3d 719, 722-23 (Pa.Super. 2013) (internal quotations and citations omitted). Importantly, "the jury, which passes upon the weight and credibility of each witness's testimony, is free to believe all, part, or none of the evidence." ***Commonwealth v. Ramtahal***, [], 33 A.3d 602, 607 ([Pa.] 2011).

***Commonwealth v. Sebolka***, 205 A.3d 329, 336-337 (Pa.Super. 2019).

A person will be found guilty of aggravated assault if he "attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon." 18 Pa.C.S.A. § 2702(a)(4). As noted by the Commonwealth, this court has repeatedly held that intent is established when a defendant discharges a firearm into a building he knows to be occupied. (Commonwealth's brief at 5.)

> As we previously stated, the intent to commit aggravated assault is established when the accused intentionally acts in a manner which constitutes a substantial or significant step toward perpetuating

serious bodily injury upon another. [**Commonwealth v. Lopez**, 654 A.2d 1150, 1154 (Pa.Super. 1995)]. The Commonwealth correctly notes that this Court has found the requisite intent to commit aggravated assault when the accused has fired a gun into a building he knew was occupied. **See Commonwealth v. Eaddy**, [] 614 A.2d 1203 ([Pa.Super. 1992), **appeal denied**, [] 626 A.2d 1155 ([Pa.] 1993). We have also held that discharging a weapon into a structure in which people live is enough to demonstrate the intent to commit aggravated assault. **Commonwealth v. Hunter**, [] 644 A.2d 763, 764 ([Pa.Super.] 1994), **appeal denied**, [] 668 A.2d 1125 ([Pa.] 1995). "Because the possibility exists that a person in the home could be harmed if someone were to shoot into the home, an attempt to cause serious bodily harm to such a person can be inferred." **Id.**

**Commonwealth v. Rosado**, 684 A.2d 605, 609-610 (Pa.Super. 1996).

During the trial, the Commonwealth presented the testimony of Warren Mayo, a person in whom appellant confided when they were both inmates at the Dauphin County Prison. (Notes of testimony, 7/10/19 at 273.) Mayo testified that appellant told him that he was familiar with Erazo's house and where the camera was located. (**Id.** at 276.) Appellant also told Mayo that while appellant was driving to Erazo's house, he had seen Ally coming home the night of the shooting and appellant specifically noted that Ally looked right at his face but did not see him. (**Id.** at 275-276.) Mayo further testified that appellant explained that, "when he shot up through the window it was impossible for anyone to have seen him because he was facing [at an angle away from the window]." (**Id.** at 277.) Finally, Mayo testified that appellant had referred to Erazo and Ally as "the bitch and her daughter." (**Id.** at 278.)

Taken in the light most favorable to the Commonwealth, as verdict winner, we find that the Commonwealth established beyond a reasonable doubt that appellant possessed the requisite intent to commit aggravated assault when he discharged a firearm into Erazo's house. Therefore, appellant's first issue is without merit.

In his second issue, appellant raises a weight of the evidence claim.

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:
>
>> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.
>
> This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained:
>
>> The term "discretion" imports the exercise of judgment, wisdom and skill so as to

- 10 -

> reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

> ***Commonwealth v. Clay***, [] 64 A.3d 1049, 1055 ([Pa.] 2013) (internal citations omitted).

***Commonwealth v. McClelland***, 204 A.3d 436, 447 (Pa.Super. 2019), ***appeal denied***, 217 A.3d 214 (Pa. 2019).

Appellant specifically contends that the evidence against him was, "unreliable, contradictory, and incredible with respect to establishing his identity as the individual who fired a gun into the house occupied by the complaining witness." (Appellant's brief at 34.) Put another way, appellant extends an invitation for us to reassess the jury's credibility determinations in his favor. This is an invitation that we must decline. Because we cannot substitute the jury's judgment on the credibility of the evidence presented with our own, we conclude that the trial court did not abuse its discretion when it denied appellant's weight of the evidence claims.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/24/2020