J-E02004-22

2023 PA Super 80


COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
DEREK MURCHISON :
:
Appellant : No. 3585 EDA 2019

Appeal from the PCRA Order Entered November 27, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0913011-2002


BEFORE: PANELLA, P.J., OLSON, J., DUBOW, J., KUNSELMAN, J., NICHOLS, J., MURRAY, J., McLAUGHLIN, J., McCAFFERY, J., and SULLIVAN, J.

OPINION BY McCAFFERY, J.: **FILED MAY 10, 2023**

Derek Murchison (Appellant) appeals from an order entered in the Philadelphia County Court of Common Pleas that dismissed, without a hearing, his third petition filed pursuant to the Post-Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546. As will be discussed below, a jury convicted Appellant of first-degree murder and related charges in connection to the death of Linda Willis (the victim). Appellant contends the PCRA court erred in finding he was not entitled to relief when new DNA[1] evidence revealed that (1) someone, not

---

[1] The term "DNA" refers to deoxyribonucleic acid, a molecule that carries and encodes the human genome. The extraction and identification of unique features of an individual's DNA is used as an identification technique for forensic purposes in criminal investigations. **See** Merriam-Webster's Collegiate Dictionary, 11th Ed., 2003.

Appellant, left blood at the crime scene, and (2) someone, again not him, touched the weapon used in the commission of the murder, which contradicts the prosecution's theory of the case. Appellant suggests that if this new evidence had been presented to the jury, it would have reached a different outcome; and therefore, the court erred in dismissing his petition. For the reasons below, we decline Appellant's proffer to disturb the court's determination and affirm its order.

## I. Facts and Procedural History

We begin by summarizing the evidence and testimony introduced at Appellant's trial and then will turn to a review of relevant post-conviction proceedings, including Appellant's acquisition of new DNA test results and his related request for a new trial based upon this after-acquired evidence.[2]

*A. Murder Investigation, Pretrial DNA Testing, & Trial*

On October 5, 2001, the victim was found lying dead in her Philadelphia home. At that time, Michael Cannon was a tenant in the victim's home and served as a key Commonwealth witness at Appellant's trial. He testified about events that occurred at the victim's residence, her personal relationships, and his discovery of her body on October 5th. Cannon described how the victim, an addict, permitted people to smoke crack cocaine in her living room in

---

[2] The facts have been summarized from the PCRA court's June 25, 2020, Pa.R.A.P. 1925(a) opinion and the certified record.

exchange for drugs. In addition, she provided sexual services to Cannon and other men to obtain funds to support her drug habit. The victim also maintained a romantic relationship with an individual named Cornell Mayrant.

According to Cannon, Appellant was a close acquaintance of the victim and a frequent visitor in her home around the time of the murder. Appellant shared a crack cocaine habit with the victim and, according to Cannon, the two collaborated in a scheme to purchase the drug. As part of this arrangement, Appellant stole items of clothing from his employer and gave them to the victim who, in turn, exchanged them on the street for money and/or drugs.

On October 4, 2001, at about 11:00 p.m., Cannon was lying down in his upstairs bedroom in the victim's home when he heard her call for him from the living room. Cannon, however, did not respond as he assumed the victim intended to ask for money to buy crack, as she frequently did. Cannon claimed he did not hear sounds of a struggle on October 4th. The next day, Cannon twice walked by the victim's body as it lay on the couch, thinking she was merely sleeping. He later telephoned the police after discovering, around 7:30 p.m., that the victim was dead.

When police investigators arrived at the victim's home, they discovered a five-foot wooden bed slat or board in her living room next to her sofa. Blood on the board suggested it was used in an attack on the victim. A toy fire truck was recovered on top of the board and a bloody, trampled newspaper

confirmed that a struggle occurred in the victim's residence. Investigators noted that she was naked below the waist and that her underwear was located on the floor near the sofa.

Investigators collected several items for forensic testing in addition to the board, the toy truck, and the newspaper. These items included a white towel and a gray blanket recovered from the victim's sofa. Because Cannon got the victim's blood on his clothing when he found her, police officials collected his boxer shorts, jacket, t-shirt, jeans, socks, and sneakers. Subsequently, investigators submitted blood stains found on Cannon's boxers, jeans, and a single sock for DNA testing.

No fingerprint evidence linked Appellant to the victim's murder. At the time of Appellant's 2004 trial, police investigators were unable to recover fingerprint evidence from the wooden board believed to have been used in the assault on the victim. Moreover, a partial fingerprint lifted from the toy fire truck found at the crime scene offered insufficient points for identification.

Testimony elicited from the medical examiner (ME) revealed that **the victim died from asphyxiation caused by strangulation** inflicted over the course of several minutes.[3] Her face, head, neck, and ribs also bore scratches,

---

[3] The victim's time of death was not clearly established by the evidence introduced at trial. The ME estimated that the victim died between midnight and noon on October 5, 2001, or possibly earlier. This timeline, however, conflicted with the testimony of two witnesses, Faithlyn Gordon (Gordon) and Mayrant, who claimed they saw the victim on her porch around 4:00 p.m. on
*(Footnote Continued Next Page)*

abrasions, bruises, and other indicia of blunt force trauma consistent with strikes from a blunt object. Toxicology tests showed that the victim ingested cocaine up to an hour before her death.

The victim's state of undress caused investigators to suspect sexual assault. Notwithstanding these suspicions, tests performed on oral, rectal, and vaginal swabs obtained during the victim's autopsy did not reveal the presence of spermatozoa. Despite extensive pretrial forensic testing, no DNA analysis linked Appellant to the crime scene.

A post-mortem examination showed the presence of human tissue under the victim's fingernails and DNA testing of this tissue revealed contributions from two unknown males. The contributors' DNA did not match the DNA profiles of Appellant, Cannon, or Mayrant. Forensic testing also showed that the DNA profile of the tissue recovered from the fingernails of the victim's left hand differed from the DNA profile of the tissue recovered from the fingernails of her right hand.

Laboratory technicians conducted pretrial DNA testing on the wooden board, the toy fire truck, the gray blanket, and the white towel recovered on or near the living room sofa where Cannon discovered the victim's body. DNA material recovered from blood stains on the wooden board and the toy fire

---

October 5th, only a few hours before Cannon claimed to have discovered the victim's corpse and telephoned authorities. **See** N.T., 6/14/04, at 107-125.

truck was consistent with the victim's genetic profile. However, forensic tests available at the time of Appellant's trial were unable to detect DNA deposits on the wooden board and the toy fire truck from any other contributor.

Investigators also analyzed blood and semen deposits recovered from the gray blanket collected at the crime scene. DNA testing of the blood stains found on the blanket identified the victim as a contributor. These laboratory tests excluded Appellant, Cannon, and Mayrant as contributors. Analysis of semen stains on the blanket also excluded Appellant, Cannon, and Mayrant. However, partial DNA profiles from at least three unknown men were recovered from the semen deposits on the blanket.

Two suspected semen stains on the white towel were also subjected to forensic analysis. Appellant and Mayrant were excluded as contributors of genetic material recovered from both areas. Cannon could not be excluded as a minor contributor of genetic material recovered from one of the stains found on the towel. Partial DNA profiles from no fewer than two unknown males were developed from tests performed on the semen stains found on the towel.

Forensic analysts also subjected Cannon's boxer shorts, jeans, and a single sock to DNA testing. The victim was included as a contributor to a blood stain found on the heel of Cannon's sock. DNA testing techniques available prior to Appellant's trial could not definitively identify contributors to the blood

stains found on Cannon's boxer shorts and jeans. The victim, however, could not be excluded as the source of blood[4] found on Cannon's underwear.

Without forensic evidence that connected Appellant to the crime scene, the Commonwealth's case relied heavily upon the testimony of three witnesses who relayed what Appellant said to them in the days, weeks, and months following the victim's murder. None of these individuals, however, witnessed the killing.

The first witness, Karen Thomas,[5] met Appellant when she lived in the victim's home for approximately one month in 2001. Sometime between 2:00 a.m. and 3:00 a.m. on October 5, 2001, Thomas observed Appellant two blocks from the victim's residence carrying a tote bag that contained clothing he was attempting to sell. According to Thomas, Appellant complained that he just left the victim's home because "that bitch put [him] out." PCRA Ct. Op., 6/25/20, at 3. Appellant then asked Thomas if she knew where or to whom the victim sold clothing. Thomas declined to answer and walked away from Appellant.

---

[4] We note the blood on Cannon's underwear was described as "a small and rather light blood stain." N.T., 6/11/04, at 60.

[5] Thomas testified that the Commonwealth agreed to assist her in enrolling in a drug rehabilitation program in exchange for her testimony at Appellant's 2004 trial.

The second witness, Dasheika Bowie, the mother of four of Appellant's children, testified that she and Appellant shared a residence in October 2001, but they were no longer were in a romantic relationship at the time of Appellant's 2004 trial. According to Bowie, Appellant returned to their shared residence one evening in October 2001 and told her he had been in a fight with a young guy and his girlfriend. Appellant presented with a black eye, scratches on his neck, and an injured lip. Bowie testified that Appellant said he hit the woman with "a stick" and left the area without knowing whether she was dead or alive. PCRA Ct. Op. at 3. Appellant also told Bowie that he refused a request by the young man to "finish [the woman] off" after striking her. *Id.*

The final witness, Carolyn Hunt, is the mother of two of Appellant's children. Hunt testified that she introduced Appellant to the victim sometime between 1998 and 1999 when she resided in the victim's home. According to Hunt, Appellant came to her residence in January 2002 and confessed to killing the victim. Specifically, Appellant admitted that he knocked the victim unconscious with a punch to the face because she could not account for a shortage in either crack cocaine or money from one of their clothing transactions. When the victim regained consciousness, Appellant strangled her and struck her in the head with a stick before leaving the house covered

in blood. Appellant also told Hunt that he believed he heard someone upstairs in the victim's house when he and the victim began to argue.[6]

To support its case at trial, the Commonwealth introduced evidence intended to demonstrate Appellant's consciousness of guilt. This evidence consisted of police testimony concerning two events. In the first episode, Appellant, on August 3, 2002, attempted to escape custody by climbing through the ceiling of a police interview room while awaiting interrogation. *See* PCRA Ct. Op. at 5 n.3. In the second episode, a sheriff's detective thwarted Appellant's attempt to escape custody by climbing through a vent in the ceiling of a holding room at the courthouse. *See id.*

The Commonwealth also introduced a letter Appellant wrote to Hunt from prison four months after she testified at his preliminary hearing. In it, Appellant appeared to concede his presence at the crime scene, stating he did not kill the victim but merely found her dead. He also appeared to warn Hunt against becoming involved in the case, telling her to "think about what [she is] saying" and suggesting that she "made a very, very big mistake." *See* N.T., 6/10/04, at 138-144, 159, 172.

_____

[6] The Commonwealth also called Nola Rutledge to rebut Appellant's attacks on Hunt's credibility. Rutledge testified that Hunt contemporaneously informed Rutledge about Appellant's confession. Rutledge also testified that, in January 2002, Hunt told Rutledge that Appellant admitted that he choked the victim and struck her with something while the two argued. *See* N.T., 6/11/04, at 6-21.

At the conclusion of trial on June 16, 2004, a jury found Appellant guilty of first-degree murder in the victim's death, as well as possession of an instrument of crime ("PIC") and escape.[7] Thereafter, on August 10, 2004, the trial court sentenced Appellant to serve life imprisonment without the possibility for parole for his first-degree murder conviction. In addition, the court imposed two to five years' imprisonment for PIC and one to two years' incarceration for escape, to run consecutively to one another, but concurrently to Appellant's sentence for first-degree murder.

*B. Direct Appeal and Earlier PCRA proceeding*

This Court considered this matter twice on direct appeal. In the first direct appeal, a panel affirmed Appellant's judgment of sentence after determining that Appellant waived his appellate claims because counsel failed to file a complete set of trial transcripts and failed to develop meaningful arguments with specific references to the record. *See Commonwealth v. Murchinson*, 899 A.2d 1159, 1162 (Pa. Super. 2006).[8] This Court again affirmed Appellant's convictions and sentences after Appellant's direct appeal

_____

[7] *See* 18 Pa.C.S. §§ 2502, 907, and 5121(a), respectively. Appellant was originally charged with criminal homicide, encompassing first-degree murder, third-degree murder, and voluntary manslaughter. All three homicide offenses were submitted to the jury for consideration.

[8] Our prior decisions disposing of Appellant's first and second direct appeals were captioned as "Commonwealth v. Murchinson," whereas Appellant's name in the instant appeal is spelled "Murchison." We shall refer to the respective cases according to the spelling which appears in each caption.

rights were reinstated pursuant to an order granting collateral relief. *See Commonwealth v. Murchinson*, 708 EDA 2007 (unpub. memo.) (Pa. Super. Apr. 28, 2008). The Pennsylvania Supreme Court denied Appellant's subsequent petition for allowance of appeal. *See Commonwealth v. Murchison*, 286 EAL 2008 (Pa. Oct. 17, 2008).

Appellant filed a second PCRA petition (his first substantive petition) on January 9, 2009, alleging ineffective assistance of both trial and appellate counsel. After counsel was appointed, the PCRA court denied the petition without a hearing on May 24, 2010. We affirmed the order denying collateral relief on May 3, 2011. *See Commonwealth v. Murchison*, 1574 EDA 2010 (unpub. memo.) (Pa. Super. May 3, 2011).

*C. Present PCRA Petition & New DNA Testing*

In the years following Appellant's trial, significant advancements in DNA collection and profiling technology have occurred. Newly-emerged extraction techniques and analytical methodologies, known as "Touch DNA" or "Contact Trace DNA,"[9] now enable the collection of DNA from traces of blood, skin cells, sweat, semen, tears, or mucous that may remain on a surface. Availing

_____

[9] Touch DNA, also known as Trace DNA "is a forensic method for analyzing DNA left at the scene of a crime. It is called 'touch DNA' because it only requires very small samples, for example from the skin cells left on an object after it has been touched or casually handled, or from footprints." *See* Touch DNA, WIKIPEDIA, THE FREE ENCYCLOPEDIA, https://en.wikipedia.org/wiki/Touch_DNA, (last visited January 25, 2022) (footnotes omitted).

himself of this new technology, Appellant, on October 18, 2012, filed a petition for DNA testing pursuant to 42 Pa.C.S. § 9543.1, followed by an amended petition on June 13, 2013. On June 3, 2014, the court granted the petition and ordered DNA testing of materials that remained within the Commonwealth's custody.

On September 4, 2015, Appellant filed a PCRA petition alleging that newly-obtained, exculpatory DNA test results met the criteria for after-acquired evidence that would entitle him to relief. *See* 42 Pa.C.S. § 9543(a)(2)(vi).[10] Appellant's petition relied upon several new DNA laboratory reports issued between September 4, 2015, and July 6, 2016.[11] Among other things, the reports revealed the following new findings, which were compared to the pretrial testing results.

**First, the wooden board**. Pretrial forensic testing of blood stains on the wooden board established the presence of DNA consistent with the victim's genetic profile. Those forensic tests, however, were unable to detect DNA on the wooden board from any other contributor. New tests conducted on portions of the wooden board that were not stained with the victim's blood revealed the presence of trace DNA from an unknown contributor who could

---

[10] The petition was amended on July 6, 2016, to address additional DNA test results.

[11] Specifically, there were three reports dated June 15, 2015, July 6, 2015, and May 4, 2016.

not have been Appellant. *See* Petition for Post-Conviction Relief Pursuant to 42 Pa.C.S. § 9543, 9/4/15, Exhibit A, DNA Lab Report, 7/6/15, at ¶¶ 1 and 2 and Exhibit B, DNA Lab Report, at ¶ 6. Mayrant could not be excluded as a contributor to the trace DNA deposit obtained from the area of the board that was not bloodstained. *See id*. at ¶ 6.

**Next is Cannon's sock.** Pretrial DNA analysis confirmed the victim as a contributor to a blood stain found on the heel of Cannon's sock. New tests, however, showed the presence of DNA from a second, unknown contributor (not Appellant) in the blood stain found on the heel of Cannon's sock. *See* Petition for Post-Conviction Relief Pursuant to 42 Pa.C.S. § 9543, Exhibit B, DNA Lab Report, 6/15/15, at 1-2 (two contributors to blood stain); *see also* DNA Lab Report, 7/6/15, at ¶ 2 (excluding Appellant as contributor).

**Third is Cannon's boxer shorts.** Pretrial DNA testing techniques could not definitively identify contributors to the blood stain found on Cannon's boxer shorts. The victim, however, could not be excluded as a source of this deposit. New tests definitively identified the victim as the source of blood detected on Cannon's boxer shorts.[12] *See* DNA Lab Report, 6/15/15, at ¶ 2.

---

[12] The DNA sample was taken from the inside waistband of Cannon's boxer shorts. *See* DNA Lab Report, 6/15/15, at 1.

**Lastly, a blanket and towel.**[13]   Pretrial testing detected three unknown contributors to the semen stains found on the blanket recovered from the victim's sofa.  Cannon could not be excluded as a minor contributor for the sperm found on the towel.[14]   New tests excluded Appellant as a contributor of the sperm found on both items.  The tests further established four more unknown male contributors to the semen stains found on the blanket, and the the towel revealed two unknown male DNA profiles.  **See** Amended Petition for Post-Conviction Relief Pursuant to 42 Pa.C.S. § 9543, 7/5/16, at ¶¶ 11 and 40; **see also id.** at Exhibit E, DNA Lab Report, 5/4/16, at 1-2.

On July 9, 2019, the Commonwealth submitted a letter to the PCRA court stating that "after thoroughly reviewing the DNA testing results and the trial notes, the Commonwealth will agree to PCRA relief."  Commonwealth Letter, 7/9/19.  The Commonwealth's letter further advised the PCRA court that, **in exchange for the Commonwealth's agreement not to oppose Appellant's request for PCRA relief**, Appellant agreed to "plead *nolo contendere* to third-degree murder and PIC with a negotiated term of incarceration of 20- to 40 years."  **Id.**

---

[13] Police recovered the blanket and towel from the couch where the victim's body was found.  **See** Petition for Post-Conviction DNA Testing Pursuant to 42 Pa.C.S. § 9543.1, 10/18/2012, at 6.

[14] **See** N.T., 6/11/04, at 115.

However, on October 29, 2019, the PCRA court issued notice of its intent to dismiss Appellant's petition pursuant to Pa.R.Crim.P. 907. The court's notice declared that Appellant's petition was untimely and lacked merit. Appellant responded to the court's notice on November 15, 2019.[15]

On November 27, 2019, the PCRA court entered its order dismissing Appellant's petition for untimeliness and lack of merit. Appellant filed a timely notice of appeal on December 17, 2019. The PCRA court did not order Appellant to file a concise statement of errors complained of on appeal but issued an opinion pursuant to Pa.R.A.P. 1925(a) on June 25, 2020.

In its opinion, the PCRA court reversed its earlier determination, as noted in its Rule 907 notice and order, that Appellant's petition was untimely and, instead, explained that Appellant's timely petition was nonetheless subject to dismissal because it lacked substantive merit. *See* PCRA Ct. Op. at 2 n.2 (finding Appellant's petition timely under 42 Pa.C.S. § 9543.1(f)(1)[16]).

_____

[15] On November 26, 2019, the Commonwealth reiterated its position that Appellant was entitled to relief in the form of a new trial, emphasizing its view that the new DNA test results, if presented at Appellant's 2004 trial, likely would have produced a different outcome. *See* Commonwealth Letter, 11/26/19.

[16] Section 9543.1(f)(1) provides: "After the DNA testing conducted under this section has been completed, the applicant may, pursuant to section 9545(b)(2) (relating to jurisdiction and proceedings), during the one-year period beginning on the date on which the applicant is notified of the test results, petition to the court for postconviction relief pursuant to section 9543(a)(2)(vi) (relating to eligibility for relief)."

As there is no dispute surrounding the timeliness of Appellant's petition, we shall not discuss this issue further.

## II. Questions Presented

Appellant raises the following issues for our review:

Did the PCRA court err in finding that the new evidence identifying "touch" DNA on the wooden board that belonged to someone other than [Appellant] was "the same" as DNA evidence presented at trial showing merely that blood from two stains on a different part of the wooden board belonged to the victim?

Did the PCRA court compound that error by concluding, [based upon] that erroneous finding, that all of the new DNA evidence – including not only the new "touch" DNA on the board, but also new DNA evidence showing blood from a second person at the crime scene who was not [Appellant] – was "merely cumulative" of evidence presented at trial?

Did the PCRA court err as a matter of law when it applied the wrong legal standard and dismissed [Appellant's] unopposed PCRA petition on the basis that the new evidence did not by itself "establish his actual innocence" and therefore would not have led to a different outcome?

Appellant's Brief at 3-4.

## III. Argument

Appellant alleges in this appeal that the PCRA court made erroneous findings of fact and conclusions of law in rejecting his claim that the results of new DNA testing constitute after-discovered evidence which entitle him to relief under 42 Pa.C.S.A. § 9543(a)(vi). As Appellant's claims are closely related, we address them in a single discussion.

Appellant first contends that the new DNA evidence is not the same as the DNA evidence presented at his 2004 trial. *See* Appellant's Brief at 26. He

specifically points to the wooden board and states, "the PCRA court repeatedly relied on the proposition that the jury heard evidence at trial 'that [Appellant's] DNA was not on the wooden slat,' and that the new DNA evidence regarding the wooden board is the same as the DNA testing presented at trial[.]" *Id.* at 26-27 (reproduced record citations omitted). Appellant avers, "This flawed factual premise is not supported by the record and led, in turn, to a flawed legal analysis of the second prong of the test for whether new evidence warrants PCRA relief – namely, whether the new evidence is merely corroborative or cumulative." *Id.* at 27. He further asserts the jury never heard that his DNA was not on the board, but rather, "the Commonwealth used the two pre-trial DNA test results from the board merely to show that [the victim]'s blood was on the board, and to support the inference that someone had beaten her with the board." *Id.* at 28. He states, "The results of the DNA evidence heard by the jury merely confirmed that obvious inference." *Id.*

Appellant then turns to the new DNA evidence and alleges "it was the first time that any evidence was presented either connecting, or eliminating any particular person, let alone [him], from touching that area of the board." *Id.* at 29-30. Therefore, Appellant argues the court erred in finding that the new evidence was merely cumulative because the "systematic exclusion of [himself] from the board used to beat [the victim] is evidence of a completely different character than the identification of [the victim]'s blood on the board."

- 17 -

*Id.* at 30. He also suggests that the presence of an unknown person's DNA on the board "tends to show that a person held the board before leaving it at the crime scene, and that person was not" Appellant. ***See id.*** at 32 (emphasis omitted). Additionally, Appellant highlights purported discrepancies with the testing of Cannon's sock, his boxer shorts, the blanket, and towel. ***See id.*** at 32-34. He contends that the new DNA evidence raises credibility questions concerning Cannon's testimony, and "provides far more persuasive support for [his] innocence than was previously available[ as it is] far more than merely corroborative or cumulative." ***Id.*** at 34.

Appellant also contends the new DNA evidence would likely result in a different outcome because the Commonwealth's case centered on circumstantial evidence, and thus, "the new evidence would have had a substantial impact on the jury's deliberation and would likely have changed the outcome of the case." Appellant's Brief at 34. He asserts the PCRA court relied upon the wrong standard when it stated that the new evidence could not "establish his actual innocence." ***See id.*** (citation omitted). Appellant states that the PCRA requires only that the new evidence "would have changed the outcome of the trial if it had been introduced." ***See id.*** at 35, citing 42 Pa.C.S. § 9543(a)(2)(iv). He reiterates that the new DNA evidence shows that someone touched the unstained end of the wooden board that was used

to beat the victim, and that he was not that person. *Id.* at 37.[17]  Lastly,

Appellant states the Commonwealth's "concession" that the "new evidence

would likely change the result should be afforded significant persuasive value

by this Court." *Id.* at 39.

### IV. Argument

Our standard of review of an order denying PCRA relief is well-

established:

> Our review of a PCRA court's decision is limited to examining
> whether the PCRA court's findings of fact are supported by the
> record, and whether its conclusions of law are free from legal
> error.  We view the findings of the PCRA court and the evidence
> of record in a light most favorable to the prevailing party.  With
> respect to the PCRA court's decision to deny a request for an
> evidentiary hearing, or to hold a limited evidentiary hearing, such
> a decision is within the discretion of the PCRA court and will not
> be overturned absent an abuse of discretion.  The PCRA court's
> credibility determinations, when supported by the record, are
> binding on this Court; however, we apply a *de novo* standard of
> review to the PCRA court's legal conclusions.

*Commonwealth v. Mason*, 130 A.3d 601, 617 (Pa. 2015) (citations and

quotation marks omitted).

To be entitled to PCRA relief, a petitioner must plead and prove by a

preponderance of the evidence, that his conviction or sentence resulted from

---

[17]  Appellant also speculates that "the jury struggled to reach its verdict"
because it "deliberat[ed] over the course of two days and ask[ed] multiple
questions, including about lesser degrees of murder." Appellant's Brief at 38.

- 19 -

one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2),

which provides, in relevant part:

> (2) That the conviction or sentence resulted from one or more of
> the following:

> \* \* \*

> (vi) The unavailability at the time of trial of exculpatory
> evidence that has subsequently become available and would
> have changed the outcome of the trial if it had been
> introduced.

42 Pa.C.S. § 9543(a)(2)(vi).

> To establish such a claim, a petitioner must prove that (1) the
> evidence has been discovered after trial and it could not have been
> obtained at or prior to trial through reasonable diligence; (2) the
> evidence is not cumulative; (3) it is not being used solely to
> impeach credibility; and (4) it would likely compel a different
> verdict.

***Commonwealth v. Cox***, 146 A.3d 221, 228 (Pa. 2016) (citations and

quotation marks omitted). ***See also Commonwealth v. Small***, 238 A.3d

1267, 1273 n.1 (Pa. 2020); ***Commonwealth v. D'Amato***, 856 A.2d 806, 823

(Pa. 2004).

## IV. PCRA Court's Findings

Here, the PCRA court found the following,

> [Appellant] is unable to prove that the more recent DNA results
> are not cumulative and would have likely compelled a different
> verdict.

> First, none of the claimed "new" DNA results are in fact new
> and would be cumulative of the evidence already produced at trial.
> [Appellant] makes much of the fact that he was excluded as a
> contributor of DNA on the wooden slat. However, at trial, the jury
> was, in fact, presented with evidence that [Appellant]'s DNA was

- 20 -

not on the wooden slat. Moreover, they also were informed that he was not one of the contributors of the sperm on the towel and blanket and that there were several unknown male contributors of DNA on the towel and blanket.[5] The only truly "new" piece of information from the more recent DNA testing is that the DNA on Cannon's sock came from [the victim] and an unknown person. Significantly, at trial, the jury learned that the DNA from Cannon's sock came from [the victim], but did not know about the unknown person's DNA. . . . Thus, the DNA results from the most recent testing are cumulative of the DNA evidence that was produced already at trial.

_____

[5] [The victim] engaged in prostitution to support her drug habit; therefore, it would not be strange for multiple men's semen to be on items in her home. Clearly, the jury did not give this much weight.

_____

[Appellant] argues that the newer DNA testing results, specifically the lack of [his] DNA on the wooden slat, are not "merely" cumulative, but are "of a higher grade or character than what was previously presented on a material issue," and therefore support relief. *See . . . Small*, [189 A.3d at 975]. However, to the contrary, this evidence is not of a higher grade or character. In fact, it produced the very same result, namely, that [Appellant]'s DNA was not found on the wooden slat. Thus, the jury already was presented with this evidence at trial and, knowing that [Appellant]'s DNA was not on the wooden slat, chose to find him guilty of [the victim's] murder.

Last, none of this claimed "new" DNA evidence is exculpatory in any way and would not have changed the outcome at trial. Pennsylvania courts have repeatedly held that negative DNA results, meaning cases where a person's DNA material is **not** found, do not establish actual innocence. *Commonwealth v. Brooks*, 875 A.2d 1141, 1147 (Pa. Super. 2005). "In DNA as in other areas, an absence of evidence is not evidence of absence." *Id.* (quoting *Commonwealth v. Heilman*, 867 A.2d 542, 544 (Pa. Super. 2005)). *See also Commonwealth v. Smith*, 889 A.2d 582, 586 (Pa. Super. 2005) ("The absence of [the] appellant's DNA [in or on the evidence to be subjected to testing] cannot be meaningful and cannot establish his actual innocence of

the murder."). The fact that [Appellant]'s DNA was not found on these items, particularly the wooden slat, is meaningless and does not establish his actual innocence of killing [the victim] by strangulation. What renders it even more meaningless is that the jury was presented with this same evidence at trial — that [Appellant]'s DNA was **not** detected at the crime scene — and the jury still chose to find [him] guilty of [the victim's] murder. Furthermore, the medical examiner determined that [the victim's] cause of death was manual strangulation, not trauma caused by the wooden slat. (N.T. 6/10/04, p. 55). Thus, whether [Appellant] was excluded as a source of DNA on the wooden slat in no way establishes his actual innocence since the wooden slat was not even the murder weapon. The record demonstrates that the jury convicted [Appellant] not based upon DNA evidence, but rather upon the medical examiner's conclusion that [the victim] was strangled, by witness Thomas' testimony that placed [Appellant] near [the victim's] house with a bag of stolen clothes, and by [Appellant]'s own confessions to witness[es] Hunt and Bowie. Since there was overwhelming witness testimony at [Appellant]'s trial, [he] is unable to show that his newer DNA testing results would likely compel a different verdict. Thus, no relief is due.

PCRA Ct. Op. at 8-10 (emphasis in original).

### III. Analysis

We agree with the PCRA court's determination that the new DNA testing is merely cumulative and was not likely to compel a different result. As such, we affirm on the basis of its opinion, but set forth the following additional analysis.

First, it is imperative to compare the pretrial DNA evidence with the "new" DNA evidence. The pretrial DNA evidence revealed the following: (1) the two male contributors of DNA found under the victim's fingernails did not match the DNA profiles of Appellant, Cannon, or Mayrant; (2) forensic tests were unable to detect DNA deposits on the wooden bed slat or toy fire truck

besides the victim; (3) blood and semen testing of the grey blanket excluded Appellant, Cannon, and Mayrant as contributors; (4) semen testing of a towel excluded Appellant and Mayrant, but Cannon could not be excluded as a minor contributor; and (5) analysis of Cannon's boxer shorts (upper left rear), jeans (upper right leg), and a sock (heel) revealed the victim as a contributor on his sock only, but contributors to the blood stains on his underwear and jeans could not be definitively identified though the victim could not be excluded.[18]

In comparison, the "new" DNA evidence now revealed that (1) testing of the wooden slat presented the victim's DNA, as well as the presence of trace DNA from an unknown contributor who could not have been Appellant; (2) there was the presence of a second, unknown contributor in the blood stain found on Cannon's sock and Appellant was excluded as a contributor; (3) the victim was the source of blood detected on Cannon's boxer shorts; and (4) a fourth unknown contributor was found as to the semen stains on the blanket.

Contrary to Appellant's argument, when viewing the two kinds of evidence together, the "new" testing provides no substantial change in the evidence apart from (1) the victim's blood officially being confirmed on Cannon's boxer shorts and (2) Appellant being excluded as the unknown

---

[18] The locations of the blood stains were taken from Appellant's amended PCRA petition. **See** Petition for Post-Conviction DNA Testing Pursuant to 42 Pa.C.S. § 9543.1 at 6.

contributor on the wooden board.  Nevertheless, with respect to that board, no other person's DNA was identified on the wooden slat beside the victim's at the time of Appellant's trial or now.  While the "new" DNA testing revealed the presence of trace DNA from an unknown contributor who could not have been Appellant, this cannot be viewed as consequential concerning the outcome of the trial when looking at the other evidence.

We emphasize the fact the victim's cause of death was manual strangulation.  *See* N.T., 6/10/04, at 55.  When reviewing the totality of the circumstances in connection with this crucial fact, the "new" DNA evidence is neither inculpatory nor exculpatory.  The PCRA court centered its analysis on this fact.  Indeed, the "new" DNA evidence neither implicates Appellant nor exonerates him.  At best, it introduces evidence of a third-party contributor with respect to Cannon's clothing, but the jury was presented with similar evidence at the 2004 trial as to possibility of other contributors, including Cannon, and it still chose to find Appellant guilty.

Moreover, the fact that the "new" DNA evidence confirming the victim's blood on Cannon's boxer shorts is not as outcome determinative as Appellant suggests.  The jury was presented with testimony that Cannon was the first person to discover the victim's body.  He testified that he saw her body on the couch and tried to wake her up by shaking her head.  *See* N.T., 6/9/04, at 89-90.  There was also testimony that the victim's nose was caked with blood, there was blood coming out of her ear, and blood around her as well as on the

floor. *See id.* at 21, 23.  Based on this testimony, the jury could have inferred that when Cannon reached down to touch the victim, her blood would most likely end up on his clothing.  As such, the confirmation of the victim's DNA on Cannon's boxer shorts is insignificant when looking at the testimony *in toto*.

Likewise, the evidence of the unknown contributors on the blanket, the towel, Cannon's sock, and trace materials on the wooden board is also insignificant in light of the fact that the jury was presented with the following evidence: (1) the victim was a crack cocaine addict who allowed other addicts to use drugs in her house in exchange for money; (2) she rented rooms to boarders; and (3) she also engaged in prostitution in her house to support her habit.  *See* PCRA Ct. Op at 2. Therefore, the fact that there was evidence of numerous unknown contributors at scene is not substantially indicative of another perpetrator due to the transient nature of the home.

Furthermore, we call attention to the testimony of several eyewitnesses whose cumulative testimony established that:  (1) Appellant was in the vicinity of the victim's home around the time of the murder, (2) he was observed to have significant scratches and injuries on his person; and (3) most importantly, he confessed to killing the victim.[19]  We reiterate the following

---

[19]  It also merit mentioning that Appellant attempted to escape custody on two occasions. *See Commonwealth v. Spotz*, 84 A.3d 294, 316 (Pa. 2014) (flight may constitute circumstantial evidence of consciousness of guilt).

testimony. Karen Thomas,[20] the victim's roommate, testified that on the night of the murder, she saw Appellant two blocks from the victim's home, and he indicated that was where he was coming from but the victim had "put [him] out." *See* PCRA Ct. Op at 3. Dasheika Bowie, the mother of four of Appellant's children, testified that Appellant disappeared around the time of the murder and after he returned, she saw that he had a black eye and a busted lip as well as scratches on his neck. *See id.* He told Bowie that he had gotten into a fight with a man and woman and that he hit them with a stick. *See id.* Lastly, Carolyn Hunt, the mother of two of Appellant's children, testified that in January of 2002, Appellant confessed to her that he murdered the victim. *See id.* at 4. Appellant explained that an argument concerning their illegal joint business turned into a physical altercation, in which Appellant punched and choked the victim and she passed out several times. *See id.* Appellant said he then strangled her, struck her with a wooden stick, and left. *See id.* The testimony of these witnesses was significant. As the PCRA court properly concluded, the record established that the jury convicted Appellant based on the cause of death and the witness testimony, which placed Appellant near

_____

[20] To the extent there is a question concerning Thomas' credibility because she testified that the Commonwealth agreed to assist her in enrolling in a drug rehabilitation program in exchange for her testimony, we note the jury heard that testimony and still found her to be credible based on the conviction. *See Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011) (stating "the jury, which passes upon the weight and credibility of each witness's testimony, is free to believe all, part, or none of the evidence.").

the victim's house on the night of the murder, as well as his own confessions to two witnesses — not the DNA evidence. *See* PCRA Ct. Op.at 10.

Lastly, to the extent that Appellant argues that the PCRA court applied the incorrect standard, we disagree. We note the court properly opined that Appellant was required to demonstrate that the "more recent DNA results [we]re not cumulative and would have likely compelled a different verdict." PCRA Ct. Op. at 8; *see also id.* at 10 (stating Appellant was "unable to show that his newer DNA testing results would likely compel a different verdict."). The court's reference to "actual innocence" concerned prior case law which held that "negative DNA results, meaning cases where a person's DNA material is not found, do not establish actual innocence." *Id.* at 9 (emphasis omitted), *citing* **Brooks**, 875 A.2d at 1147. The court's statement did not actually go to the standard but to inferences that can or cannot be made regarding negative DNA tests. As such, Appellant's argument has no merit.

At this juncture, we point out the Commonwealth's inconsistent and perplexing position regarding this matter. As mentioned above, the Commonwealth submitted a letter to the PCRA court stating that reviewing the DNA testing results and the trial notes, it would agree to PCRA relief. Commonwealth Letter, 7/9/19. The Commonwealth also indicated that in exchange for its promise, Appellant agreed to "plead *nolo contendere* to third-degree murder and PIC with a negotiated term of incarceration of 20- to 40 years." *Id.* However, when the Commonwealth first filed its appellee's brief,

it changed course from its position at the PCRA proceeding level and stated that the "PCRA court properly denied relief after reasonably determining that the new DNA evidence would not have affected the verdict." Commonwealth's Brief, 2/10/21, at 20. One day later, it filed application to withdraw its brief, which was granted. *See* Order, 2/26/21. It then filed a new appellee's brief, wherein it returned to its original position that Appellant was entitled to PCRA relief based on the new DNA testing. *See* Commonwealth's Brief, 2/26/21, at 2-24.

We recognize the duty of the District Attorney is to seek justice and not merely a conviction. However, a District Attorney also has a duty to be an advocate for the citizens of the Commonwealth and not replace the findings of the PCRA court which are consistent with the record. Under the facts of the instant case involving first degree murder, it is clear from the record and the PCRA court's analysis, the conviction was based on the testimony of the witnesses as well as on the cause of death and Appellant's confession to two witnesses. The DNA evidence was not the basis of the conviction.

As such, the Commonwealth had no logical basis to agree to PCRA relief for Appellant and propose a plea agreement with a significant reduction in jail time. The Commonwealth's actions reflect an abdication in its responsibility to advocate for the victim. We remind the Commonwealth that it represents the victim-citizens of this Commonwealth in criminal matters. Though unavailing, Appellant was provided with a fair process regarding the

examination of the contested DNA evidence. Thus, in light of the totality of the circumstances that weighed in favor of denying relief, it is unacceptable for the Commonwealth to ignore the legal standards set forth by statute and case law for determining whether a defendant should be granted post-conviction relief by offering a plea agreement that clearly was based on an unfounded decision.[21]

In sum, we conclude the PCRA court properly found the "new" DNA evidence was merely cumulative and not likely to compel a different result.

_____

[21] The analysis set forth in Justice Dougherty's concurring opinion in the recent decision, **Commonwealth v. Wardlaw**, 249 A.3d 937 (Pa. 2021), is insightful:

> In its brief and at oral argument, the district attorney in this matter joined the appellant in asking us to reverse the Superior Court on the discrete legal issue presented. Had we adopted this shared position — rather than overwhelmingly rejected it — we would have tied the hands of all other prosecutors across the Commonwealth. **It seems to me that, to ensure the Commonwealth's interests are adequately represented when a legal issue in an appeal has statewide implications and a county district attorney does not intend to advocate in opposition to the defense position, the district attorney should be required to communicate that decision to the Attorney General. Such a process would afford the Attorney General the opportunity to make a more timely and reasoned assessment of whether his involvement in the case is warranted**, either by means of intervention or as an *amicus curiae*.

***Id.*** at 955 (emphasis added).

Accordingly, Appellant has not met the high burden of demonstrating that he is entitled to PCRA relief.

Order affirmed.

President Judge Panella, Judges Murray, McLaughlin and Sullivan join the opinion.

Judge Olson files a dissenting opinion in which Judges Dubow and Kunselman join.

Judge Nichols files a dissenting opinion.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/10/2023